Raphael SMITH, III, Appellant,

v.

UNITED STATES, Appellee.

No. 92–CF–158. ·

District of Columbia Court of Appeals.

Argued June 7, 1994.
Decided Oct. 31, 1995.

---

Eli Gottesdiener, Public Defender Service, Washington, DC, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Laura A. Cordero, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher and Roy W. McLeese, III, Assistant United States Attorneys, Washington, DC, were on the brief, for appellee.

Before WAGNER, Chief Judge,* and SCHWELB, Associate Judge, and MACK, Senior Judge.

WAGNER, Chief Judge:

Following a jury trial, appellant, Raphael Smith, III, was convicted of one count of armed robbery (D.C.Code §§ 22–2901, –3202 (1989) ) and one count of possession of a firearm during a crime of violence (D.C.Code § 22–3204(b) (1989) ). These charges arose in connection with the robbery of Jorge

---

*Judge WAGNER was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on June 14, 1994.

Frederick (the complainant) on December 11, 1990.[1] Following the robbery, Frederick placed a 911 call to the police, which the police recorded. Prior to trial, the government filed a motion *in limine* seeking the admission of the taped 911 call. The trial court granted the motion after a hearing. On appeal, Smith argues that the trial court erred in admitting the tape recording of the 911 call because it did not qualify for admission under either the spontaneous utterance or prior identification exception to the hearsay rule. Specifically, he contends that the circumstances surrounding the purported spontaneous utterance show conscious and reflective thought by the declarant and that the statement did not identify or describe appellant. We conclude that the admission of the taped 911 call, even if error, did not substantially sway the judgment; therefore, we affirm.

## I.

### A. *The Motions Hearing*

The government filed a motion *in limine* seeking the admission into evidence of a tape-recorded 911 call made by Frederick to police following the robbery. The trial court held a hearing on the motion and listened to the tape-recorded 911 call before ruling that the evidence was admissible as an excited utterance, and for the most part, as within the prior identification exception to the hearsay rule.[2] In making its ruling, the trial court stated:

> It seems to me that the law is quite plain in this jurisdiction, and having listened to the tape, it's clear to me that the complainant was in a high state of excitement at the time he made the call. He was nervous, he was upset, it was made shortly after the offense. And it seems to me it clearly comes within the definition of an excited utterance, and it seems to me moreover that 90 percent of it comes within a state-

ment of identification the defendant made....

Smith's attorney argued that Frederick's statements on the tape showed his ability to reflect before making the call to the police, thereby taking away any semblance of spontaneity. Specifically, Smith argued that Frederick was able to walk the few blocks home after the crime and make the call, which consisted of a series of questions and answers, rather than a spontaneous statement. He argued further that fifteen minutes elapsed between the incident and the phone call, providing time for reflection by the declarant. The trial court rejected these arguments, stating in pertinent part:

> Well, I think it clearly comes within the definition of an excited utterance.
>
> First of all, there is clearly the presence of a serious occurrence, that is, this man was robbed at gunpoint, and secondly, it clearly caused a state of nervous excitement and shock in the declarant as evidenced from the declarant's tone of voice during the statement.
>
> The declaration was certainly made within a short period of time after the occurrence and thus gives assurance that the declarant had not in my view reflected upon the statement. The mere fact that it was 15 minutes rather than a few minutes, than a lesser time is not dispositive....
>
> And likewise, the fact that some of the statements were made in response to questions does not eliminate their character as excited utterances.
>
> And finally, ... there are present in this case circumstances which in their totality suggest that these statements were spontaneous and they are sincere.... This was an extremely serious event. This man had been robbed at gunpoint. He was almost breathless during this telephone call. Anybody who listens to this tape, and I would certainly expect any reviewing court to listen to the tape, it seems to me

1. In the transcript Frederick's first name is spelled as "George." The indictment refers to complainant as "Jorge" Frederick.

2. The 911 call was not transcribed by the court reporter; however, the tape is a part of the record on appeal. Both appellant's counsel and the government have submitted transcriptions in their respective briefs. The transcriptions conform to the tape recording. It is reproduced as an appendix to this opinion.

has to be persuaded that this man was excited. He was upset, he was concerned and that came across in this conversation.

Alternatively, the trial court ruled that ninety to ninety-five percent of the statement was admissible under the identification exception to the hearsay rule.

At the conclusion of Frederick's motion's testimony, Smith's attorney requested that the trial court reconsider its ruling because the testimony showed that Frederick did not want to call the police when he arrived home, but his mother persuaded him to do so after some fifteen minutes. As a result of Smith's request for reconsideration, the trial court recalled Frederick to the stand in an effort to determine whether his excited state at the time of the 911 call was caused by the occurrence of the robbery or by his discussion with his mother. In response to the court's questions, Frederick testified that he was initially reluctant to call the police, but his mother insisted. He said he was "very upset and angry" and was "real nervous" when he made the call because he had never been robbed at gunpoint. The trial court reaffirmed its original ruling, stating:

> I'm going to stay with my original ruling. I think it was correct. I don't think the issue is ... whether the person makes the spontaneous utterance, and I think the more—I think the more appropriate word here is the excited utterance of his own accord or whether it's prompted by somebody else.... And I think the issues that are important are what my state of mind was at the time I made the statement. And it's clear to me and I credit this man's testimony that he was angry, he was upset, he'd never been robbed before, and those are the kinds of circumstances that *Nicholson* says under the first of the three prongs in *Nicholson* tend to give the statement credence and tend to justify its admissibility under this exception, and so it will be received.[3]

## B. *The Trial*

Frederick testified at trial that on December 11, 1990, at approximately 10:30 p.m., he was on his way home from Roosevelt High School where he attended evening classes. As he walked on New Hampshire Avenue, he saw a small blue Chevette, which was "making a lot of noise," with a broken side window covered with a black plastic bag. As Frederick continued walking, he lost sight of the car. He made a right turn onto Gallatin Street where he saw two men approaching from approximately fifteen feet away. One of the men, later identified as Smith, had a gun in his hand. As the two men approached closer, Smith cocked the gun. Smith's companion "tried to take a punch at [Frederick]," but Frederick stepped back and punched the man instead. As Smith came toward Frederick with the gun in hand, he asked, "Hey, cuz, what's up with the jacket?" At the time, Frederick was wearing a multicolored leather jacket with the number "44" on the back and the sleeves, which he had purchased just four days earlier. Frightened by the weapon, Frederick removed the jacket and threw it to the ground. Smith picked it up and told his companion to see if Frederick had any money in his pockets. Frederick emptied his pockets immediately, dropping his keys, cigarettes, ten dollars and some change in the process. Smith then told Frederick to walk away slowly. As Frederick complied, he heard Smith say, "I should shoot you," but the second assailant told Smith not to. Fearing for his life, Frederick began running away in a "zigzag" pattern to avoid being shot. He took a circuitous route home to prevent the two assailants from following him home. During the robbery, Frederick had noticed the blue Chevette he had seen earlier parked in an alley nearby.

As he came to his backyard, Frederick called out to his mother. When she opened the back door, he told her that he had just been robbed at gunpoint. His mother told him to call the police, but he was reluctant to do so. After arguing for approximately five to six minutes, Frederick called the police. The jury heard the tape of the 911 call, which had been the subject of the *in limine* motion. The police arrived approximately fifteen minutes after Frederick's call. Frederick spoke to the police for a half hour before they

3. The reference is apparently to *Nicholson v.* *United States,* 368 A.2d 561, 564 (D.C.1977).

drove him to the area where the robbery had occurred. He could not locate the robbers or the blue Chevette; however, Frederick found his keys, cigarettes, and the change he had taken from his pockets in the area where he had been robbed.

Less than a week after the robbery, on the morning of December 17, 1990, Frederick was at work when Smith came into the office.[4] When Frederick saw Smith, he recognized him immediately as the robber. According to Frederick, Smith was wearing the same black hat he wore the day of the robbery. Frederick turned to his co-worker, Lieutenant Quarles–El, and said "[t]his is the guy that robbed me."

Smith walked to the counter and began talking to Major Abdul–Malik. Frederick then walked behind the counter, faced Smith, and said "Yeah, I do like my 44 jacket." Smith looked as if he recognized Frederick and quickly removed his hat and started moving around. Then, Smith moved toward a wall where it was more difficult for Frederick to see him. Smith, who "appeared to be quite jittery," started to leave, but his counselor, Major Abdul–Malik, said, "Hey, come back," "I haven't finished yet."[5]

Smith signed his name to the visitor's log before leaving, and Frederick got his name from the log sheet and asked his supervisors for access to Smith's file. Frederick contact-

ed the police and reported that the person who robbed him had just come into his office and that his name was Raphael Smith.

The next day, Frederick met with Detective Harold Moseley of the Metropolitan Police Department (MPD). During the meeting, Frederick reviewed two photo arrays, consisting of nine photographs each. Frederick identified Smith from the second set of photographs, and he told Detective Moseley that he was "100 percent sure" of the identification. On March 6, 1991, Frederick identified Smith as the "gunman" at a lineup held at police headquarters. More than two months after the robbery, the police searched Smith's house, but they could not find Frederick's jacket.[6]

## II.

Smith argues that the trial court erred in admitting the complaining witness' recorded 911 call into evidence as a spontaneous utterance because: (1) the complainant's admission that he misrepresented during the call that the robbers had stuck a gun in his face, demonstrated that the call was not spontaneous; (2) the complainant consciously reflected on whether to call the police; and (3) the statement did not meet the technical requirements of the exception. A spontaneous or excited utterance is a well-recognized exception to the hearsay rule.[7]

---

4. Frederick worked at the Black Man's Development Center, a third-party custodian for defendants on pre-trial release. The parties were instructed not to mention where Frederick worked during trial.

5. Major Abdul–Malik, testifying on behalf of the defense, presented testimony that was somewhat different from the testimony provided by Frederick. Abdul–Malik testified that on December 17, 1990, Smith arrived at his place of employment and spoke with him at the front counter for approximately five minutes. Abdul–Malik testified that during that time he did not hear Frederick call out to Smith or say anything to Smith, although he admitted that he "wasn't really paying attention to ... Frederick" and that there was a "strong possibility" that Frederick could have said something to Smith, but Abdul–Malik simply did not hear it. Abdul–Malik also testified that he did not notice anything unusual about Smith when he left. Abdul–Malik testified that he entered Smith's name into the log book when Smith entered the office, and that Freder-

ick identified Smith as the robber and called the police after Smith left the office.

6. Smith presented an alibi through the testimony of his mother and one of her employees, Debra Jackson. Both women testified that appellant was working with them in a downtown office building on the date and at the approximate time of the robbery. The government presented evidence that an access card was required to enter the building between 5:30 p.m. until 8:30 a.m. the next morning. Although Mrs. Smith had an access card, the records did not show her entering by the card. The security system records the time, person and number of the card when used. Debra Jackson had no access card.

7. The Federal Rules of Evidence refer to "excited" utterance rather than spontaneous utterance. Fed.R.Evid. 803(2). The rule provides that such statements are not excluded from evidence by the hearsay rule, even though the declarant is available as a witness. *Id.* It defines excited utterance as "[a] statement relating to a startling

Price v. United States, 545 A.2d 1219, 1225–26 (D.C.1988); Harrison v. United States, 435 A.2d 734, 736 (D.C.1981) (en banc). Whether a statement constitutes a spontaneous utterance depends upon the particular facts of each case, and its admissibility as such is within the sound discretion of the trial court. Price, 545 A.2d at 1225–26; Young v. United States, 391 A.2d 248, 250 (D.C.1978); Harris v. United States, 373 A.2d 590, 593 (D.C.1977). There are three basic requirements for admission as a spontaneous utterance:

> (1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark.

Nicholson, supra note 3, 368 A.2d at 564. "The decisive factor in determining admissibility of declarations ... is that circumstances reasonably justify the conclusion that the remarks were not made under the impetus of reflection." Id. (citations omitted).

■ Appellant argues that the trial court erred in assuming that the first element, a startling event which causes a state of nervous excitement, was satisfied based merely upon a finding that the robbery "upset" the complaining witness and that the event would have suspended the reflective powers of a reasonable person. He contends that this test is contrary to the requirement that the startling event must still the reflective faculties of the particular declarant. As factual support for his argument, appellant points out that the complainant suffered no physical injury and was resigned to the loss of his jacket during a brief robbery which ended some fifteen minutes before he made the statement.

We find no basis to conclude that the trial court applied the wrong standard in considering the first element for establishing an

excited utterance. "[I]f the evidence suggests that 'the declarant was highly distraught and in shock at the time the statement was uttered,' the requisite element that the declarant be in a 'state of nervous excitement' is satisfied." Price, supra, 545 A.2d at 1226 (quoting Alston v. United States, 462 A.2d 1122, 1127 (D.C.1983) ). The evidence showed that appellant robbed the complainant at gunpoint just after cocking his weapon. Appellant then threatened to shoot the complainant after instructing him to walk away, which prompted the complainant to run in zigzag patterns, hoping to avoid being killed. It was only a short distance to the complainant's house, and there was evidence that he was still in a state of excitement when he arrived at home, reported the robbery to his mother, and called the police, albeit at his mother's urging. The complainant testified that he felt upset, angry and "real nervous" when he made the call, a fact confirmed by his recorded 911 call.

The trial court found that there was "a serious occurrence, that is, this man was robbed at gunpoint, and ... it clearly caused a state of nervous excitement and shock in the declarant as evidenced from the declarant's tone of voice during the statement." The evidence was more than adequate support for the trial court's finding. There is no basis to conclude, as appellant argues, that the trial court based its ruling on a finding that the complainant was merely upset or that the court failed to focus on the complainant's state of nervous excitement as a result of the event. The trial court stated specifically that the declarant's state of mind at the time he made the statement was the significant factor. Accordingly, the trial court properly found in favor of admissibility of the statement on the first element. See Price, supra, 545 A.2d at 1226 (first element is satisfied upon a showing that declarant was in state of shock as the result of a startling event at the time statement was uttered).

■ Appellant argues that the trial court also erred in finding the second element for a spontaneous utterance satisfied because it

event or condition made while the declarant was under the stress of excitement caused by the

event or condition." Id.

failed to recognize that the substantial interval between the robbery and the 911 call provided time for reflection. This argument is belied by the record. The trial court observed that about fifteen minutes elapsed between the robbery and the 911 call, which "gives assurance that the declarant had not in [the court's] view reflected upon the statement." The court also found this fact not to be dispositive. *See Alston, supra,* 462 A.2d at 1127 (Although of great significance, the time element is not controlling on the second element of spontaneous utterance). The critical factor is that the "'declaration [was] made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it.'" *Id.* (quoting *Nicholson, supra* note 3, 368 A.2d at 564); *Price, supra,* 545 A.2d at 1226. This is exactly what the trial court found.

■ Since time alone is not controlling in determining the spontaneity of an exclamation, courts have even found that statements "made one hour after the alleged offense [may be] allowed in [evidence] when the age and condition of the declarant support spontaneity." *Alston, supra,* 462 A.2d at 1127 (citing *Wheeler v. United States,* 93 U.S.App. D.C. 159, 164, 211 F.2d 19, 24 (1953), *cert. denied,* 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954), and *Bandoni v. United States,* 171 A.2d 748, 750 (D.C.1961)). Certainly, statements made within minutes of the incident are more readily admissible as a spontaneous utterance. *See Alston,* 462 A.2d at 1127. In this case, the complaining witness testified that no more than fifteen minutes elapsed between the robbery and the 911 call.[8] While not the most brief interval, it is a relatively short period of time.[9] On this record, we cannot say that the trial court erred in finding that the second element was satisfied.

■ Appellant also argues that the trial court erred in finding as to the third element that the totality of the circumstances suggested spontaneity and sincerity of the statement. *See Alston, supra,* 462 A.2d at 1126–27 (citing *Nicholson, supra* note 3, 368 A.2d at 564). He contends that the trial court essentially "double counted" the first two elements by relying upon them as the basis for its conclusion as to the third element. He also argues that the trial court failed to factor into its analysis the fact that the declarant did not want to call the police initially. He further contends that the call could not have been spontaneous as the declarant had the presence of mind to take a circuitous route home following the robbery.

We reject the double-counting argument because the totality of the circumstances, which the trial court must consider in assessing the third element, necessarily takes into account the circumstances involved in the first two elements. *See Nicholson, supra* note 3, 368 A.2d at 564; *Alston, supra,* 462 A.2d at 1128. The fact that the complainant took a circuitous route home and had to be prodded by his mother to call the police are also factors which should be considered in the totality of the circumstances. Contrary to appellant's claim, there is no indication that the trial court did not do so here. When appellant requested reconsideration of the court's initial ruling to admit the recorded call, Frederick was recalled to the stand for the specific purpose of determining whether his excited state was caused by the shock of being robbed at gunpoint or by his discussion with his mother. The trial court credited Frederick's testimony that he had never been robbed before and that he was upset and angry at the time by reason of these events. That Frederick took a circuitous route home does not vitiate the spontaneous character of the statement. He testified that he was frightened for his life and was afraid

---

8. Appellant points out that the time could have been greater, in light of testimony that the incident occurred "just after" or "at approximately" 10:30 p.m., while the 911 call was made at 10:55 p.m. The trial court had an evidentiary basis to conclude that the time lapse was 15 minutes based upon the witness' testimony that it was "[t]owards five minutes to 15 minutes." We

cannot say that the court's factual finding was clearly erroneous.

9. The startling event was lengthened beyond the robbery itself because the assailant made a death threat which caused appellant to run for his life and make his way home.

that the gunman and his accomplice might pursue him. The trial court found the level of excitation was sustained over the course of the incident and still present when Frederick made the call, as corroborated by the recorded conversation. This is a reasonable inference which the trial court could make from the evidence that it credited. This aspect of its ruling is not clearly erroneous; therefore, we cannot disturb it. *Alston,* 462 A.2d at 1128.

### III.

The real gravamen of appellant's challenge to the admission of the recorded 911 call is that the revelation at trial, that the complainant/declarant purposefully misrepresented during that call that the robber had a gun in his face, demonstrates that the declarant engaged in conscious reflection, thereby rendering the statement inadmissible as an excited utterance as a matter of law. The government argues that the plain error standard applies because appellant did not raise this issue in the trial court. Appellant contends that his failure to object on these grounds was the result of the government's failure to disclose timely the information. After the 911 call was played for the jury, the government elicited from the complaining witness that, contrary to what he stated on the tape, the gunman had not actually held the gun up to his face. The witness explained that

> I just said that because I was very nervous, and I thought by me saying that, they would you know, come quicker to the scene.

This was the first time that this information had been disclosed to the defense. Appellant contends that neither the trial court nor appellant's trial counsel recognized the significance of the misrepresentation to the court's earlier ruling on the question of the admissibility of the spontaneous utterance. For these reasons, appellant argues that he did not waive his right to argue on appeal that the late disclosure interfered with the trial

court's exercise of discretion in ruling on the admissibility of the taped 911 call.

We consider first what standard of review applies. The government argues that appellant's failure to raise with the trial court the impact of the complainant's/declarant's admitted misrepresentation on its earlier ruling to admit into evidence the 911 tape requires plain error review. Appellant contends that, in light of this court's opinion in *James v. United States,* 580 A.2d 636 (D.C.1990), this argument must fail. In *James,* the government introduced at trial, under the spontaneous utterance exception, a statement made by an unavailable witness to a shooting to the effect that it was the defendant who had shot the victim. *Id.* at 638–41. After the statement had been introduced and the trial had almost concluded, the government disclosed to the defense that prior to making the alleged spontaneous utterance, the declarant had told another witness to remove the murder weapon and another gun from the crime scene. *Id.* Defense counsel failed to move the court to revisit the issue, grant a mistrial, or grant a continuance. *Id.* at 638–44. On appeal, this court held, at least in part because of the government's failure to disclose timely the information, that the defense "could not have been expected, upon disclosure, to recognize the relevance of this evidence to the earlier hearsay ruling," and therefore, the defendant did not waive his right to complain on appeal that the government's late disclosure interfered with the trial court's exercise of discretion and led to the erroneous admission of hearsay testimony. *Id.* at 644.

 The government argues that *James* is not applicable because the prosecutor's failure to disclose the information in *James* was determined by the court to be a separate *Brady* violation.[10] The government contends that Frederick's prior inconsistent statement is not *Brady* material, but rather a statement disclosable under the Jencks Act only after the witness' testimony. We disagree. Prior inconsistent statements of a key government witness may be sufficiently

---

10. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires the government to disclose to the defense, upon re-

quest, any evidence in its possession which is favorable to the accused and material to guilt or punishment.

material to guilt as to constitute *Brady* material. *Coleman v. United States,* 515 A.2d 439, 448 (D.C.1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 205 (1987); *Lewis v. United States,* 408 A.2d 303 (D.C. 1979). Unquestionably, Frederick, the only eyewitness to the crime, was the key prosecution witness in the case. His admitted misrepresentation to the police that appellant had stuck a gun in his face meets the level of materiality which requires disclosure under *Brady.* The information was such that, had it not been disclosed to the jury, our confidence in the outcome of the trial would have been undermined. *See Coleman,* 515 A.2d at 448. Thus, there is no meaningful difference between this case and *James* insofar as the finding of a *Brady* violation is concerned.

■ The question remains whether appellant should have requested the court to revisit the question of the admissibility of the spontaneous utterance or move for a mistrial once the statement was disclosed. In determining whether to apply the plain error standard in *James,* we stated that if we were convinced that the defense counsel had made a tactical decision not to seek a mistrial after the *Brady* material was disclosed, it was likely that we would have determined that appellant had waived his right to appeal on this issue. *James,* 580 A.2d at 642 (citing *Towles v. United States,* 521 A.2d 651, 655–56 (D.C.) (en banc), *cert. denied,* 483 U.S. 1008, 107 S.Ct. 3236, 97 L.Ed.2d 741 (1987)). Whether an attorney has made a tactical choice is somewhat difficult to fathom in the first instance at the appellate level. Frequently, the question will require a factual determination. Sometimes there may be facts in the record from which the appellate court can determine that counsel's failure to object or advance an argument resulted from a tactical choice. *See, e.g., Towles,* 521 A.2d at 655. That conclusion is not so obvious in this case. Here, the possibility that the prior inconsistent statement might affect the court's earlier ruling on the admissibility of the 911 tape under the spontaneous utter-

ance exception did not occur to the prosecutor, who was apparently aware of it before the tape was played for the jury, nor to the trial court after the statement's disclosure. On the record before us, we can not say that defense counsel's failure to request that the trial court revisit the question of admissibility or move for a mistrial upon the government's belated disclosure of the information after the tape had been played was a tactical choice which bars review except for plain error.[11] *See James,* 580 A.2d at 642–43. Therefore, we review for harmless error under the standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). To find harmless error, this court must be satisfied "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Id.* at 765, 66 S.Ct. at 1248.

■ The fact that the complainant/declarant misrepresented a fact to the police during the 911 call was relevant to a determination of whether it was a spontaneous utterance. It bears upon whether the declarant's statement resulted from conscious reflection or the spontaneous reaction to the startling event. *Price, supra,* 545 A.2d at 1227 (citing McCormick on Evidence § 297, at 856 (3d ed. 1984)). Appellant argues that evidence that the declarant in fact fabricated a purported excited utterance, conclusively establishes as a matter of law that it was not an excited utterance. We need not resolve this issue because, even assuming that no part of the statement could be an excited utterance because of the admittedly fabricated portion of it, there is no basis for reversal.

In this case, the witness whose spontaneous utterance was at issue was available at trial and fully cross-examined by defense counsel. Appellant obtained information that the complainant fabricated about how the gun was used in time to seek corrective measures in the trial court and to use it to

11. Reversal for plain error is justified "only in exceptional circumstances where 'a miscarriage of justice would otherwise result.'" *Harris v. United States,* 602 A.2d 154, 159 (D.C.1992) (en banc) (quoting *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)). Under that standard, the burden is a formidable one. *Hunter v. United States,* 606 A.2d 139, 144 (D.C.), *cert. denied,* —— U.S. ——, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992).

impeach the witness during cross-examination and in closing argument. Therefore, the jury had an opportunity to consider the complainant's admitted fabrication in assessing his credibility.[12] The otherwise prior consistent statement did not elucidate what was taken in the robbery or by whom. There is nothing in the statement which identifies appellant as the perpetrator of the crime.[13] There are clothing descriptions for the two assailants on the tape recording; however, there is nothing to link appellant to that clothing. Complainant identified his assailants by race, but that characteristic is so general that it had little impact on the identification of appellant as the perpetrator of the crime. Indeed, appellant argues that the statement is not admissible under the prior identification exception because the complainant gave no description of the armed assailant, and therefore it did not constitute a prior identification.[14]

The complaining witness identified appellant as the gunman at a second sighting six days after the robbery. Each time he identified him subsequently, from a photo array, a line-up and at trial, he was positive of the identification. Appellant's alibi defense was impeached. Considering all of these factors, we conclude that it is highly probable that the admission of the tape, if error, did not substantially sway the judgment, and therefore, was harmless. *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. at 1248; *see also Clark v. United States,* 593 A.2d 186, 192 (D.C. 1991).

For the foregoing reasons the judgment of conviction appealed from hereby is

*Affirmed.*

### APPENDIX
[POLICE COMMUNICATIONS OFFICER]

This is a cassette recording from the master tape dated, December 11, 1990, bearing CCN 694464, relations to an incident which occurred in the 100 block of Gallatin Street, Northwest. Telephone portion begins at 22:55 hours, the radio portion will immediately follow. It's recorded on June 19, 1991 by Patricia Carter, communications division.

Good evening, at the tone the time will be 10:55.

COMPLAINANT: Hello?

DISPATCHER: Police Emergency Dispatcher 1–8–0

COMPLAINANT: I'm on 2nd and Gallatin, I mean, um 5016 Gallatin Street, Second Street.

DISPATCHER: What's what's wrong, dear?

COMPLAINANT: They just robbed me and I know how they look.

DISPATCHER: You do know how they look?

COMPLAINANT: Yeah, and they driving a car-

DISPATCHER: Are you in an apartment or private home?

COMPLAINANT: Um, um, apartment but I—

DISPATCHER: How were you robbed?

COMPLAINANT: Huh?

DISPATCHER: How were you robbed?

COMPLAINANT: With a gun. [Pause] Somebody stuck me up with a gun.

DISPATCHER: How many?

COMPLAINANT: Two.

---

**12.** Appellant points out that the jury was unable to reach a verdict at one point and that one juror wanted to change her vote after the weekend. We have no way of knowing the reasons for the jury's inability to reach a verdict prior to the time that it was rendered in this case nor the reason that one juror sought to change her vote sometime after the verdict was returned.

**13.** Our review of the tape reflects that the caller described two individuals by race and by clothing. However, that does not resolve appellant's argument, for he contends that any description given in no way corroborated the identification of appellant, and therefore, the identification exception does not apply. *See Morris v. United States,* 389 A.2d 1346, 1349–51 (D.C.1978). We need not resolve this issue because of the conclusion we reach that any error in admitting the 911 tape was harmless.

**14.** In light of our disposition, we need not resolve this issue.

DISPATCHER: Black or White?

COMPLAINANT: Black. Um-

DISPATCHER: What were they wearing?

COMPLAINANT: Um, um. Striped, striped jacket, um, striped, uh shirt, right? And one of 'em got on all blue and with a baseball cap on and-

DISPATCHER: All blue what?

COMPLAINANT: Um, Um, Um, jacket and hat.

DISPATCHER: OK, the dude who had on the stripped shirt, what color pants did he have on?

COMPLAINANT: Um, like light blue, uh, uh sky blue, you know like baby blue? Um, I think they was Guess pants and I think he was wearing some boots.

[Pause]

DISPATCHER: That was dark blue for the other subject sir?

COMPLAINANT: Yeah—an-and the car, right? Was a little, um, a little, like them Chevettes? Blue. Dark blue. And it had like a -one broken window. [Pause] I ain't see the license plate. Cuz they had a gun to, like, to my face.

DISPATCHER: You don't know what state license plate it was?

COMPLAINANT: Um, um, D.C., they must have been D.C. but I ain't seen them though.

[Pause]

DISPATCHER: You're gonna be in front of this location sir?

COMPLAINANT: Yes, yes.

DISPATCHER: We're going to have a unit to respond to 5-zero-one six Second Street. Where were they last seen headed sir?

COMPLAINANT: Oh, um, I, they just told me to keep on running because otherwise they would have shot me.

DISPATCHER: All right, we're going get a unit there as soon as possible.

COMPLAINANT: All right.