**Angelo D. JONES, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 02–CM–271.

District of Columbia Court of Appeals.

Submitted May 13, 2003.
Decided July 24, 2003.

John A. Briley, Jr., appointed by this court, was on the brief for appellant.

Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher and Michael T. Truscott, Assistant United States Attorneys, were on the brief for appellee.

Before TERRY, STEADMAN, and SCHWELB, Associate Judges.

PER CURIAM.

Appellant, Angelo Jones, appeals his conviction at a bench trial of simple assault arising out of an apparent domestic dispute. D.C.Code § 22–504 (1981). He raises three arguments for reversal. We affirm.

■ 1. *Insufficiency of the evidence:* We review this assertion under the oft-repeated and well-established standard, viewing the evidence in the light most favorable to the government and recognizing the factfinder's role in weighing the evidence, determining the credibility of witnesses, and drawing justifiable inferences from the evidence. *See, e.g., Lewis v. United States,* 767 A.2d 219, 222 (D.C. 2001). At trial, Officer Miller, a police officer who responded to the scene within a minute after an emergency radio call, testified that appellant matched the description given by the police dispatcher and stated, "I did it, I headbutted her." Officer Miller observed the victim, who was placed in an ambulance; she was vomiting bile, had injuries to her lower lip, was

crying, and had a shaky voice. Officer Miller testified that the victim said she had been in an altercation with appellant and when pushing began, she grabbed his wrists and he used his head to "headbutt" her, hitting his forehead to her mouth. We can hardly say that this is a case where "there has been no evidence produced from which guilt may reasonably be inferred." *Id.*

■ 2. *Admission of victim's "excited utterance"*: "[W]hether a statement constitutes a spontaneous utterance depends upon the particular facts of each case, and its admissibility as such is within the sound discretion of the trial court." *Welch v. United States*, 689 A.2d 1, 4 (D.C.1996). "In order to qualify as an excited utterance, a statement must have been made, 1) in response to a startling event which causes the declarant to be in a state of nervous excitement or physical shock, 2) within a reasonably short period of time after the event to ensure that the declarant did not have time to reflect and 3) under circumstances which, in their totality, indicate that the statement was spontaneous and sincere." *Malloy v. United States*, 797 A.2d 687, 690 (D.C. 2002). Pursuant to these criteria, the trial court did not abuse its discretion in admitting into evidence the victim's statements to the police. *See, e.g., Reyes–Contreras v. United States*, 719 A.2d 503, 505–06 (D.C. 1998) (admitting as excited utterances statements made by assault victim to police shortly after assault while victim was crying and visibly upset); *(Raphael) Smith v. United States*, 666 A.2d 1216 (D.C.1995)

(admitting as excited utterances statements made in 911 call to police consisting of a series of questions and answers). Moreover, the Confrontation Clause of the Sixth Amendment does not require the government to prove that a declarant is unavailable before statements can be admitted as excited utterances. *Reyes–Contreras, supra,* 719 A.2d at 506–07.

■ 3. *Exclusion of victim's written statement:* The victim, invoking her Fifth Amendment rights, chose not to take the stand. Therefore, appellant sought leave to admit an unsworn written statement by the victim,[1] but was unable to provide to the trial court any basis for doing so in contravention of the rule against hearsay. We review for plain error. *See Patton v. United States,* 633 A.2d 800, 810 (D.C. 1993) (citation omitted) (burden on party seeking admission to identify appropriate exception to hearsay rule). On appeal, appellant suggests that the statement might be admissible as a prior inconsistent statement, but that is hardly clear from this record. No foundation was laid for its admission, *see, e.g., Parker v. United States,* 757 A.2d 1280, 1288 (D.C.2000), and in the absence of a detailed proffer, it is not shown that the statement was necessarily either "prior" to or "inconsistent" with the excited utterance within the meaning of the exception. We can find no plain error here.

The judgment on appeal is accordingly

*Affirmed.*

---

1. The statement is not in the record on appeal and appellant made no direct proffer of its precise content. Apparently it contradicted in some respects her statements to the police. *See District of Columbia v. Kora & Williams,* 743 A.2d 682, 690 (D.C.1999) (to properly preserve excluded testimony for review on appeal, trial counsel must normally make an offer of proof, to lay foundation for affirmative showing of error). Appellant's counsel did proffer to the trial court that the victim had orally told him that it was her perception that she had lied to the police and that the physical contact was accidental and not intended by the appellant as an assault.

SCHWELB, Associate Judge, concurring in the judgment.

Given the manner in which this case was presented at trial and the nature of the issues raised on appeal,[1] I am compelled to agree that Jones' conviction should be affirmed. Nevertheless, in my opinion, the case is more complex than my colleagues suggest, and it has a troubling flavor of unfairness. The statement by Cheryl Baker that incriminated Jones was admitted into evidence as an "excited utterance" (even though it consisted of answers to questions posed to her by the police), and Jones had no opportunity to cross-examine her. At trial, Ms. Baker was evidently prepared to testify and exonerate Jones, but as a result of the government's apparently routine but practically devastating suggestion that Ms. Baker might incriminate herself by so testifying, Ms. Baker was induced—admittedly on the advice of counsel, and with the concurrence of Jones' attorney—to invoke the privilege against self-incrimination, so that the defense was deprived not just of an exculpatory witness, but of the evidently favorable testimony of Jones' erstwhile accuser.

These circumstances would, I think, lead the man on the Clapham bus, *i.e.*, a reasonably intelligent and impartial person unversed in legal esoterica, to protest with some indignation that "this is not fair!" Moreover, in my view, the government, faced with the prospect of a trial in which the complaining witness might well inflict a mortal wound upon the case for the prosecution, played hardball—apparently lawful and even conventional hardball, but hardball nevertheless—that made me wince as I read the transcript of this perplexing episode.

I.

I begin with the "excited utterance," which was surely of marginal admissibility. Officer Lavern A. Miller testified that shortly after Jones had already been arrested following his admission that he "did it,"—*i.e.*, "head-butted" a then-unidentified person—she interviewed Ms. Baker. At the time, Ms. Baker, who had been crying and had a swollen lip, "wasn't frantic, but she was upset," and her voice was "a little shaky." The following question and answer ensued:

THE COURT: Was this in response to questioning by you, or did she blurt something out . . . ? [W]hat were the circumstances?

THE WITNESS: This would have been questions by me.

This exchange was followed by a bench conference, which, for reasons not explained in the record, was not transcribed.[2] The judge, however, evidently ruled that Officer Miller would be permitted to relate what Ms. Baker told her, and the officer then described the information provided by Ms. Baker:

---

1. Two of Jones' contentions on appeal—(1) that notwithstanding his admission to the police, the evidence against him was legally insufficient, and (2) that Ms. Baker's unsworn written statement exculpating Jones should have been admitted in evidence—are completely without merit. The third contention—that the judge abused his discretion by admitting Ms. Baker's oral statement to the police as an "excited utterance," is discussed in Part I of this opinion.

2. The absence of a transcript of the judge's ruling has not been raised by the defense, either in the trial court or on appeal. *Cf.* D.C.App. R. 10(a) (the record on appeal shall include, *inter alia*, the findings of fact and conclusions of law of the trial court). In this case, we have not been apprised of the trial judge's reasoning with respect to one of the principal issues in the case, but neither party brought this remarkable omission to this court's attention.

She told me her and the defendant got into a verbal altercation over her needing new tires on her car because the defendant, she said, slashed them the day before, and that he said he was going to pay. I guess some pushing started happening, she said. She grabbed his wrist by both of her hands so that he couldn't hit her, and that's when he head-butted her.[3]

Spontaneous or excited utterances are admitted on the theory—not a universally accepted one[4]—that the declarant was so excited by the precipitating event that he or she was still "under the spell of its effect," *United States v. Edmonds*, 63 F.Supp. 968, 971–73 (D.D.C.1946),[5] and therefore had no time to reflect or to tell a lie. We have held, depending on the circumstances, that a witness' response to police questioning may or may not qualify for admission as an excited utterance. *Portillo v. United States*, 710 A.2d 883, 884–85 (D.C.1998). The key inquiries on facts such as those presented here are whether there is "less chance of fabrication and a greater likelihood of accuracy," *id.* at 884, and, if the allegedly spontaneous utterance was in response to questioning, whether the interview conducted was "more deliberative in nature than spontaneous." *Id.* at 885. "The critical factor is [whether] the declaration was made within

---

3. Jones' attorney did not object to the testimony that Jones had committed a separate crime, *i.e.*, slashed Ms. Baker's tires.

4. The entire basis for the [excited utterance] exception is, of course, subject to question. While psychologists would probably concede that excitement minimizes the possibility of reflective self-interest influencing the declarant's statements, they have questioned whether this might be outweighed by the distorting effect of shock and excitement upon the declarant's observation and judgment.
2 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 272, at 205 (5th ed.1999). *See also* Hutchins & Schlesinger, *Spontaneous Exclamations*, 28 COLUM. L. REV. 432, 437 (1928) ("One need not be a psychologist to distrust an observation made under emotional stress; everybody accepts such statements with mental reservation.").

5. The court's lucid explanation of the hearsay exception for spontaneous exclamations merits quotation in full:

Spontaneous exclamations uttered contemporaneously with or immediately after an unusual occurrence and statements made shortly thereafter by a person who is still under the spell of its effect, are admissible in evidence and form one of the important exceptions to the hearsay rule. It is a well recognized psychological phenomenon that a person making an exclamation or a statement while under the influence of the excitement or shock caused by witnessing or participating in an extraordinary event, such as a murder or a serious accident, is unlikely to fabricate an untruth, but, on the contrary, has a tendency to disclose what is actually on his mind. The mental stress and nervous strain preclude deliberation and bar reflection. Declarations made while the spell endures are uncontrolled. They are practically reflex actions and may be said to be verbal photographs or images of the contents of the brain. Such utterances are likely to be made without any calculation as to their potential effect and without regard to their possible consequences. They are apt to be the truth as the person knows it. Consequently, it is safe to accept testimony as to expressions of this type, even in the absence of an opportunity to cross-examine the person who gave vent to them. These considerations form the underlying reason for this exception to the hearsay rule.
63 F.Supp. at 971. *See also Beausoliel v. United States*, 71 App. D.C. 111, 113, 107 F.2d 292, 294 (1939) (citing, *inter alia*, 3 WIGMORE, EVIDENCE § 1747 (2d ed.1923)) (hearsay exception for spontaneous exclamations applies where the "utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy.").

a reasonably short period of time after the occurrence *so as to assure* that the declarant has not reflected on [her] statement or premeditated or constructed it." *Smith v. United States,* 666 A.2d 1216, 1223 (D.C. 1995) (emphasis added; citations and internal quotation marks omitted). Before admitting a statement under the "excited utterance" exception, the court should be satisfied that "the declarant did not reflect upon the event and possibly invent a statement." *United States v. Woodfolk,* 656 A.2d 1145, 1150 (D.C.1995), *cert. denied,* 516 U.S. 1183, 116 S.Ct. 1286, 134 L.Ed.2d 231 (1996).

In this case, according to Officer Miller, Ms. Baker was not "frantic," nor did she blurt anything out, and an obvious question arises as to whether her response to Officer Miller's questions was so spontaneous and so excited that there was no opportunity for reflection or fabrication on Ms. Baker's part. Immediately after conferring with Ms. Baker, and shortly before Ms. Baker invoked her privilege against self-incrimination, Jones' attorney—an officer of the court—reported to the judge that "Ms. Baker would probably say that she lied to the police." The reliability of this representation was enhanced by the fact that, in indicating that Ms. Baker had admitted lying to Officer Miller, defense counsel was effectively making it impossible to secure Ms. Baker's testimony on his client's behalf. See Part II, *infra.* Obviously, Jones' attorney would not have told the judge that Ms. Baker would admit lying to the police if Ms. Baker had not acknowledged to counsel that she had done so.[6] But even though it had been reliably represented to the court that Ms. Baker evidently had time not only to re-

flect but also to deceive, nobody thought it appropriate to reopen the question of the admissibility of Officer Miller's testimony regarding what Ms. Baker told her. Everybody knew or should have known that the supposed excited utterance may very well have been a deliberate lie, but there was no admissible evidence showing this to be so, and the reality was therefore ignored.

In this case, one might reasonably suspect that Ms. Baker's statement to Officer Miller lacked the spontaneity and reliability required to render it admissible as an excited utterance, and this suspicion would be even more compelling if the court could consider defense counsel's seemingly reliable proffer that Ms. Baker had admitted to him that she had lied to the police. But a proffer is not evidence and, considering only the duly admitted testimony and the growing liberality with which we have applied the "excited utterance" exception, *see, e.g., Woodfolk,* 656 A.2d at 1150, I must agree with my colleagues that the defense did not show that the trial judge abused his discretion when he admitted the officer's testimony. This is especially true when Jones' counsel has made no attempt to present to the court, or to reconstruct, the judge's reasoning in admitting the evidence; I do not see how we can invalidate the finding that Ms. Baker's statement was an excited utterance without knowing what the judge said.

In my opinion, most reasonable people who read the entire transcript, including counsel's proffer, would believe that Ms. Baker was not under any "spell" when she spoke to the police, that her statement was not a "reflex action" or a "verbal photo-

---

**6.** It is, of course, possible—common sense suggests that it may even be probable—that Ms. Baker's statement to the police was true and that her apparent admission of lying was itself a falsehood designed to protect Jones, the father of one of Ms. Baker's children. It would, however, be difficult to determine which of Ms. Baker's accounts was true without seeing and hearing her testify.

graph of the brain," *Edmonds,* 63 F.Supp. at 971, and that she therefore had sufficient time to devise a lie to Officer Miller and may very well have told one. Nevertheless, the judge, considering only the evidence in the record, could properly admit Ms. Baker's report to the police as an "excited utterance" without committing reversible error.

## II.

After the prosecution rested, and after the judge denied Jones' motion for judgment of acquittal, Jones' attorney attempted to call Ms. Baker as a witness for the defense. The prosecutor, showing remarkable solicitude for the rights of a witness who had refused to testify to the government's version of events, immediately intervened: [7]

> THE PROSECUTOR: Your Honor, if we may, the Government believes that Ms. Baker may have systemic problems .... The statements that she made to the officer are inconsistent with the ones that we believe she will make to the [c]ourt today.

In other words, the government was suggesting, if Ms. Baker testified to facts exonerating Jones, she might face very disagreeable "systemic problems," an intriguing euphemism for the danger that she would be prosecuted for lying to the police.[8] The judge swiftly picked up on the government's suggestion, and he told Jones' counsel that

[y]ou should consider it carefully before you call her ... as to whether or not she's going to say, I in effect lied to the police out there when I told them such and such.

An attorney was located to consult with Ms. Baker. Unsurprisingly, on the attorney's advice, Ms. Baker elected not to testify. The "systemic problems" of the complaining-witness-turned-potential-star-witness-for-the-defense had saved the prosecution's case from what could have turned out to be an ignominious rout.

This created a circumstance which can fairly be characterized as ironic. It was the government's theory at trial that Jones intentionally and criminally head-butted Ms. Baker. In other words, according to the prosecution, Ms. Baker's statement to the police to the effect that Jones head-butted her on purpose was *true.* Yet, government counsel indicated, if Ms. Baker were to testify that Jones did *not* intentionally head-butt her, that the contact was accidental, and that (as she later told the court at sentencing) "it wasn't his fault, and he's a nice gentleman," then Ms. Baker was in danger of prosecution by the government *for lying to the police by telling Officer Miller that Jones had purposely head-butted her.* But once the danger that Ms. Baker would contradict the prosecution's theory was averted (government counsel having initiated a process which induced Ms. Baker to "take the Fifth"), the government was free to insist once again that Ms. Baker's statement to the police was true, and Jones was duly convicted on

---

7. No personal criticism of the prosecutor is intended. In my experience, her intervention was not at all unusual.

   As to whether the prosecutor had a *duty* to apprise the judge of Ms. Baker's "systemic problems," compare footnote 10, *infra,* with the text preceding it. But if it had been the prosecution and not the defense that needed Ms. Baker as a witness, I am confident that

the government would have found a way to make her testimony available.

8. The witness might, of course, also fear prosecution for perjury if she testified favorably to Jones. The possibility that she could be prosecuted for false testimony that has not yet been given cannot, however, fall within the privilege against self-incrimination.

the basis of a scenario which Ms. Baker would probably have described under oath as false if she had not been induced to decline to testify and, instead, to invoke her privilege against self-incrimination.

A criminal defendant's right to present witnesses in his own defense is a fundamental one. *Carter v. United States,* 684 A.2d 331, 336 (D.C.1996) (en banc). The defendant cannot, however, compel a witness to incriminate herself. "[I]n the crunch, when all else fails, the Fifth Amendment privilege of the witness prevails over the defendant's right to compel [her] to testify." *Id.* But "[b]ecause both rights are so precious[,] and because a forced election is so painful, it is the responsibility of the trial judge to take all reasonable steps to avoid a direct collision." *Id.*[9]

The tension between the rights of the defendant and of the witness raises unusually sensitive problems, and it is the obligation both of the judge and of the prosecutor to act accordingly. As this court has stated,

> [t]he matter becomes more delicate in a criminal trial when the judge becomes concerned that a defense witness's self-incrimination rights may be placed in unfair jeopardy. The witness's self-incrimination interests, of course, are no less in such situations. But the defense has a particularly important interest

that is also affected—the defendant's Sixth Amendment right to present all potentially exculpatory evidence. As the Supreme Court recognized in *Webb v. Texas,* [409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 ... (1972),] trial judges' efforts to protect defense witnesses' interests may impermissibly intrude upon defendants' right to produce evidence.

Perhaps the most that can be generally said with confidence in such situations is that trial judges have a special duty to seek an accommodation between witnesses' self-incrimination interests and defendants' interests in full production of relevant evidence. The judge is not barred from alerting the witness to her self-incrimination right, but the judge's authority to caution the witness should be exercised sparingly and with great caution....

> *Permitting the prosecutor to participate in admonishing the witness probably poses substantial risks of overreaching.*

*Harris,* 614 A.2d at 1283 n. 10 (quoting 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 138, at 515–16 & n. 10 (4th ed.1992)) (emphasis added); *see also People v. Shapiro,* 50 N.Y.2d 747, 431 N.Y.S.2d 422, 409 N.E.2d 897, 903–06 (1980).[10]

The effect of the prosecutor's intervention in this case, after it became evident that any testimony by Ms. Baker would

---

**9.** In *Carter,* the en banc court quoted or relied upon *Harris v. United States,* 614 A.2d 1277, 1281–82 (D.C.1992), for all of the propositions in the paragraph preceding this footnote.

**10.** In *Shapiro,* the court emphasized that "[o]ur Sixth and Fourteenth Amendment guarantees serve to insure that a criminal trial does not devolve into a game to be won or lost whatever the means." 431 N.Y.S.2d 422, 409 N.E.2d at 905. Therefore, according to the court, judges and prosecutors must exercise restraint in the kind of situation pre-

sented here, and warnings to defense witnesses regarding their privilege against self-incrimination "must not be emphasized to the point where they are transformed instead into instruments of intimidation." *Id.* The court recognized, however, that the prosecutor has an "obligation to warn potential witnesses of their possible liability for false statements under oath." *Id.* Moreover, in this case, the prosecutor's representation was to the court and not to the witness, who apparently was not even present in the courtroom.

not be favorable to the government, was to keep Ms. Baker off the witness stand. The purpose of that intervention was not explicitly stated, but can reasonably be inferred from its effect. *See, e.g., Rabinowitz v. United States,* 366 F.2d 34, 56 (5th Cir.1966). In my opinion, the government's reference to Ms. Baker's "systemic problems" started the ball rolling to the inevitable end result, namely, that Ms. Baker would not testify on Jones' behalf. That is what the government wanted to happen, and that is what happened. This was, in my judgment, the realization of the kind of danger against which we warned in *Harris,* 614 A.2d at 1283 n. 10 (quoting McCormick), in the lines we have italicized in my quotation from that case.

Perhaps I should describe more pointedly just how adversarial the adversarial process became in this criminal trial. Government counsel knew, and advised the court, that the erstwhile complaining witness was prepared to give testimony exonerating the defendant. The government made it plain, though not in so many words, that if Ms. Baker did so testify, then she would face the danger of prosecution for "lying to the police." But if, in order to avoid incriminating herself, Ms. Baker decided not to give the exculpatory testimony—if she did not create "systemic problems"—then Mr. Jones would be prosecuted (and he was in fact convicted) on the basis of the account, now claimed to be truthful, that Ms. Baker had given to the police, even though she had at least privately recanted

it. That account, said the government in effect, was true if the witness invoked her privilege and did not take the stand, but might well be treated as false enough to warrant a criminal prosecution of Ms. Baker if she waived the privilege and testified that Jones was not guilty.

At least to me, there is something alarmingly wrong with this scenario. "But is it fair?" Chief Justice Warren used to ask counsel who appeared before the Court. *See In re O.M.,* 565 A.2d 573, 584 (D.C.1989) (concurring opinion). Surely, in this case, the late Chief Justice's answer would have been "No!"

### III.

Unfortunately, Jones' attorney did not object to the prosecutor's role in bringing about Ms. Baker's invocation of the privilege against self-incrimination. On the contrary, defense counsel enthusiastically signed on to it, and Jones, represented in this court by his trial attorney, has not raised the issue on appeal.[11] Jones cannot come close to prevailing on this issue under a "plain error" standard of review, nor is this one of those exceptional cases in which we should dispose of the appeal by deciding an issue not raised by either party. *Cf. Outlaw v. United States,* 632 A.2d 408, 410 n. 7 (D.C.1993), *cert. denied,* 510 U.S. 1205, 114 S.Ct. 1326, 127 L.Ed.2d 674, (1994).

Nevertheless, in my opinion, it is a "big deal" when, as a result of an intervention

---

**11.** To be fair to defense counsel, he might well have been unsuccessful if he had tried to object to the prosecutor's intrusion into the balancing of Fifth and Sixth Amendment rights. *Harris,* the case which adopted the passage from McCormick, which I have quoted above, was overruled in part, albeit on other grounds, by the en banc court in *Carter.* It is true that in *Carter,* the court did not *address* the question whether a prosecutor may effectively *dissuade* a prospective defense

witness from taking the stand by raising the witness' potential Fifth Amendment problems. In *In re J.W.Y.,* 363 A.2d 674, 683 (D.C.1976), however, the court, after cautioning that "the possibility of extrinsic prosecution may not be used [by the government] as either carrot or stick to induce the silence of [potential defense witnesses]," nevertheless concluded that there was no impropriety where the attorney for the District "merely broach[ed] the subject of the witness' potential criminal liability."

by the prosecutor, a defendant is disabled from presenting important exculpatory testimony, especially where, as in this case, that testimony would have come from the complaining witness, the defendant's erstwhile accuser. Coupled with the admission of an "excited utterance" which was not subject to cross-examination and which, as Ms. Baker revealed to defense counsel, may well have been a deliberate lie told in response to police questioning, the government-procured "taking of the Fifth" by Ms. Baker brought about a trial in which there may have been compliance with all of the legal rules,[12] but which, in my opinion, was anything but fair in the popular common-sense meaning of that adjective. "Our duty, to paraphrase Mr. Justice Holmes in a conversation with Judge Learned Hand, is not to do justice but to apply the law and hope that justice is done." *Bifulco v. United States*, 447 U.S. 381, 402, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980) (Burger, C.J., concurring). In this case, I fear that we hope in vain.

In the first decade of the twenty-first century, the world of criminal justice is one of hard-nosed realism. It would surely be dismissed as hopelessly idealistic, and even naive, for me even to suggest that a witness should feel just as free to testify truthfully for the defense as for the prosecution, and that no prosecutor should ever use the theoretical possibility of self-incrimination as a vehicle to keep a prospective defense witness off the stand.[13] That, I would surely be told, is not the way the game is or can be played in this era of organized crime and astounding homicide rates and witness intimidation and the need to get the bad guys off the street before more innocents are slaughtered. I understand all that, but in this case, Angelo Jones has appealed from his conviction and, although he may well be guilty—he evidently made a significant admission to the police—I am haunted by a distressing reality. In my opinion, Jones did not receive a fair trial. He was convicted, in part, on the basis of an unsworn statement by Ms. Baker, who could not be cross-examined, but he was denied the opportunity to present Ms. Baker's sworn testimony, as to which she *could* have been cross-examined. That is hardly the most effective way to ascertain the truth.

But what is most disconcerting to me is that on the current state of the record and of the law, I, as an appellate judge, am powerless to do anything about what I regard as a profoundly flawed inquiry into just what happened on the night in question. I hope that this unusual combination—correct legal rulings, but a fundamentally unfair proceeding—has not resulted in the conviction of an innocent man.

---

12. In fact, I cannot point to anything that the prosecutor did that violated the law or any ethical canon. Perceiving no reversible error by the judge, I have voted to affirm Jones' conviction. But the whole is sometimes more than the sum of its parts, and for the reasons stated in this opinion, I am very uncomfortable with the result that we have reached.

13. In my days as a trial judge, when I was faced with a veritable avalanche of demonstrable lying in domestic relations litigation, I referred four of the most extreme cases to the United States Attorney for possible prosecution for perjury. *Nellum v. Nellum,* 113 Daily Wash. L. Rptr. 1421 (Super.Ct.D.C.1985). No prosecutions ensued. But none of the perjurers who escaped indictment, notwithstanding the referral of their cases, was a potential defense witness in a criminal prosecution.