**UNITED STATES v. EDMONDS.**

Criminal No. 76016.

District Court of the United States for the District of Columbia.

Jan. 15, 1946.

Edward M. Curran, U. S. Atty., and Arthur J. McLaughlin, Asst. U. S. Atty., both of Washington, D. C., for the United States.

Milton I. Lewis, of Washington, D. C., for defendant.

HOLTZOFF, Justice.

The defendant, Milis M. Edmonds, was convicted of murder in the second degree and moves for a new trial. He was charged with stabbing one William D. Brock, Jr., in the neck with a knife, thereby inflicting on him a mortal wound.

The evidence tended to show the following facts: The defendant was the manager of a restaurant in Washington, D. C., known as the White Tower and located on Fourteenth Street near Irving. About six o'clock on the morning of October 21, 1945, a party consisting of two men and two women entered the establishment and occupied a booth. Brock, a Chief Petty Officer in the Navy, was one of them. Apparently they were partially under the influence of intoxicating liquor and acted in a somewhat hilarious manner. It was asserted that one of the members of the party threw a salt shaker in the direction of a waitress named Ella Jones, who immediately telephoned for the police. The defendant then came out of one of the back rooms and was informed by Ella Jones of what had happened. Carrying a knife in his right hand, he approached the booth in which the four customers were seated, and inquired who had thrown the salt shaker. The reply was that none of them had done so. The two women members of the party promptly arose and left. They were followed by the two men, who, however, returned and expostulated with the defendant, while standing in the doorway. Some of the witnesses stated that during the verbal altercation, Brock kicked the defendant. The latter raised his right hand and stabbed Brock in the neck. The wound proved fatal and Brock died about a half-hour later.

The defendant was indicted on a charge of murder in the second degree. At the trial he denied that he had stabbed Brock, claiming that he had no knife in his possession, but that the implement in his hand was a spoon that he had picked up from the counter. He also asserted that if in fact he stabbed Brock, he did so in self-defense.

In submitting the case to the jury, the court defined murder in the second degree and manslaughter, explaining the distinction between them and indicating that if the defendant was convicted, he could be found guilty of either offense. The jury found the defendant guilty of the former.

The defendant now moves for a new trial on several grounds, which will be considered separately.

■ First, it is contended that a verdict of guilty of murder in the second degree was contrary to the evidence, and that the defendant should have been convicted of manslaughter, if at all. In its charge to the jury, the court defined murder in the second degree as a killing with malice aforethought, but without a purpose or intent to kill and without premeditation and deliberation. On this subject the court instructed the jury in detail. These instructions may be briefly summarized as follows. A killing under the influence of passion, induced by insufficient provocation, may be murder in the second degree, and an accidental or unintentional killing constitutes murder in the second degree if it is accompanied by malice. Legal malice does not necessarily mean a malicious or malevolent purpose or personal hatred or hostility toward the deceased. It is a state of mind which shows a heart unmindful of social duty and fatally bent on mischief, or which prompts a person to do an injurious act wilfully to the injury of another. Liggins v. United States, 54 App.D.C. 302, 297 F. 881. Manslaughter, on the other hand, is the unlawful killing of a human being without malice aforethought. If the killing is committed in a sudden heat of passion, caused by adequate provocation, the crime may be reduced from murder to manslaughter. A trivial or slight assault, however, is not sufficient provocation for that purpose. No exception was taken to these portions of the charge.

■■ The jury was fully warranted in reaching the conclusion that even if Brock kicked the defendant, this circumstance was not adequate provocation for the stabbing. The court is of the opinion that the verdict is in accord with the weight of the evidence and that a verdict of guilty of murder in the second degree was more reasonable than would have been a conviction of manslaughter. At the defendant's request the court charged the jury at some length on the law of self-defense, although

the defendant's contention on this score manifestly rested on a foundation of sand. The mere fact that the defendant approached the customers with a knife in his hand and wantonly and ruthlessly stabbed Brock during the altercation, exhibited a high degree of personal depravity. The killing was an atrocious act and did not have even a semblance of justification. The two women in the party had promptly made their departure at the commencement of the quarrel. While the conduct of the two men was apparently boisterous and disagreeable, yet neither of them was armed. No reason is discernible for the use of a deadly weapon under the circumstances.

The second error claimed by the defendant in support of the motion for a new trial, is found in a ruling of the court admitting testimony that immediately after he was stabbed, the deceased exclaimed, "I've been stuck." An objection to its introduction was overruled on the theory that it was a part of the res gestae. The defendant contends that it was inadmissible hearsay.

There are few topics in the law of evidence that have excited so much interest and elicited so much discussion as the exceptions to the rule which excludes hearsay evidence as incompetent, i. e., testimony as to a statement made within the hearing of the witness by another person. Such testimony is deemed unfit to be received because of its unreliability. It is considered untrustworthy: first, because of a risk of error in recollection and narration; and second, and more important, because of the inability to subject the testimony to the acid test of cross-examination, which would be possible if the person uttering the statement were produced as a witness. There are, however, several types of hearsay testimony which, in spite of these inherent defects, are shown by experience to be worthy of belief. On this basis exceptions to the hearsay rule have been evolved.

■ Spontaneous exclamations uttered contemporaneously with or immediately after an unusual occurrence and statements made shortly thereafter by a person who is still under the spell of its effect, are admissible in evidence and form one of the important exceptions to the hearsay rule. It is a well recognized psychological phenomenon that a person making an exclamation or a statement while under the influence of the excitement or shock caused by witnessing or participating in an ex-traordinary event, such as a murder or a serious accident, is unlikely to fabricate an untruth, but, on the contrary, has a tendency to disclose what is actually on his mind. The mental stress and nervous strain preclude deliberation and bar reflection. Declarations made while the spell endures are uncontrolled. They are practically reflex actions and may be said to be verbal photographs or images of the contents of the brain. Such utterances are likely to be made without any calculation as to their potential effect and without regard to their possible consequences. They are apt to be the truth as the person knows it. Consequently, it is safe to accept testimony as to expressions of this type, even in the absence of an opportunity to cross-examine the person who gave vent to them. These considerations form the underlying reason for this exception to the hearsay rule. Declarations included in this category are frequently referred to by the convenient Latin phrase, "res gestae," which literally translated means "things done" or "the transactions." It should be observed, however, that this term is not limited to such expressions, but also comprehends other matters.

One of the earliest authorities on this point is found in a ruling by Lord Chief Justice Holt, in a case decided by him at nisi prius in 1694, Thompson v. Trevanion, Skin. 402, which involved an action brought by a husband and wife for assault and battery on the latter. The Lord Chief Justice held that "what the wife said immediate upon the hurt received, and before that she had time to devise or contrive any thing for her own advantage, might be given in evidence."

In Rex v. Foster, 6 C. & P. 325, involving a prosecution for manslaughter, in which the defendant was charged with killing the deceased by driving a cabriolet over him, a witness was permitted to state that immediately after the accident he approached the deceased and asked him what was the matter, and to relate what the deceased had replied.

The Supreme Court has approved and applied this doctrine. In Travellers' Insurance Co. v. Mosley, 8 Wall. 397, 19 L.Ed. 437, the Court sustained the admission of testimony as to a statement made by the deceased to his wife that he had just fallen down stairs and hit the back of his head.

Many State courts have likewise adopted this principle. State decisions on this point

are legion. To refer to many of them would prolong this discussion to an inordinate length. A few typical cases may, however, be selected for purposes of illustration out of the plethora of authorities on this subject.

In Commonwealth v. McPike, 3 Cush., Mass., 181, 50 Am.Dec. 727, a manslaughter case, testimony was admitted to the effect that the deceased stated immediately after the fatal attack, that the defendant had stabbed her. It was held that this evidence was in the nature of res gestae.

In Commonwealth v. Hackett, 2 Allen, Mass., 136, a murder case, the court admitted testimony to the effect that at the time he was stabbed, the deceased cried out, "I'm stabbed"; and that a few moments later, he repeated, "I'm stabbed—I'm gone —Dan Hackett has stabbed me." This ruling was upheld on appeal. It will be observed that this evidence was very similar to that involved in the instant case.

In People v. Del Vermo, 192 N.Y. 470, 85 N.E. 690, also a murder case, the court sustained a ruling of the trial judge, admitting a statement made by the deceased immediately after he was wounded, to the effect that the defendant had stabbed him.

In Sheehy v. Territory, 9 Ariz. 269, 80 P. 356, likewise a homicide prosecution, the deceased shortly after he was shot, exclaimed, "Boys, I am shot." The court held that this declaration was admissible in evidence.

In Showalter v. Western Pacific R. Co., 16 Cal.2d 460, 461, 106 P.2d 895, 897, an action was brought under the Federal Employers' Liability Act to recover damages for the death of a railroad brakeman. It was contended by the plaintiff, who sued as administratrix of his estate, that the deceased had been thrown from the train by reason of a defective hand brake, which released suddenly when the deceased grabbed it. Testimony was introduced at the trial to the effect that immediately after the accident, the deceased in answer to an inquiry, stated, "I got knocked off. * * * I am all done, both legs cut off." The opinion in affirming the judgment exhaustively discusses the pertinent principle and the applicable authorities on this point.

In the District of Columbia, the decisions are at unison in approving the admission of such testimony.

In District of Columbia v. Dietrich, 23 App.D.C. 577, a person who had fallen on the sidewalk, immediately said to his companion, "I think I have broken my foot." This declaration was deemed admissible at the trial of an action for negligence against the District of Columbia.

In Patterson v. Ocean Accident & Guarantee Corp., 25 App.D.C. 46, 65, the deceased, immediately after the fatal accident, said to his wife, "I have strained my back, I have given myself a terrible wrench." The court held that this declaration was admissible in an action to recover on an accident insurance policy.

In Grant v. United States, 28 App.D.C. 169, the facts were very similar to those presented in the instant case. The defendant was convicted of murder in the first degree committed by attacking the deceased with a knife. Immediately after the assault, which resulted fatally, the deceased shouted: "Oh Mama, Mama, I am cut to death. Eddie has cut me to death." The Court of Appeals sustained the ruling of the trial judge admitting this declaration in evidence, and stated (28 App.D.C. at page 174):

"We are of the opinion that there was no error in admitting the declarations as part of the res gestae. They were made immediately after the receipt of the fatal wound and while the blood was flowing therefrom. The time at and the circumstances under which they were made reasonably indicate that they were spontaneous, and exclude the idea of deliberation or design."

In Washington Railway & Electric Co. v. Wright, 38 App.D.C. 268, a passenger on a streetcar, who had fallen from the step, exclaimed to the conductor, "You pulled too quick, you threw me." This declaration was held admissible as part of the res gestae, in an action for negligence brought against the streetcar company.

More recently this doctrine was approved and applied in Beausoliel v. United States, 71 App.D.C. 111, 113, 107 F.2d 292.

Wigmore in his Treatise on Evidence, 3d Ed., Sec. 1747, has formulated the principle under discussion in the following manner:

"* * * under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and per-

ceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts. The ordinary situation presenting these conditions is an affray or a railroad accident. But the principle itself is a broad one."

■ It is clear, therefore, that the evidence as to the spontaneous exclamation of the deceased was properly admitted at the trial.

■ Counsel for the defendant argues, however, that the evidence should have been excluded because the witness who testified that the statement was made, did not also testify that the attack had taken place. It is apparently contended that the testimony in question would have been admissible as part of the res gestae only if it had been elicited from the witness who had previously told the story of the defendant's attack on the deceased. There is no basis for the suggested distinction either on principle or authority, and no authority is cited by counsel in support of his argument. It appears to be entirely lacking in merit. Preceding witnesses had testified that the defendant stabbed the deceased with a knife. Another witness then testified that he saw the deceased turn around and heard him exclaim, "I've been stuck". Obviously, all of the evidence must be considered together. In fact, a parallel situation is encountered in many of the cases which sustained the admissibility of such evidence. On this basis the spontaneous exclamation was clearly part of the res gestae and, therefore, properly admitted.

It may be observed that this evidence did not play an important part at the trial. Unlike similar declarations that have been admitted in some of the cases discussed above, in this instance the deceased in his spontaneous exclamation did not identify his assailant, but merely indicated that he had been stabbed. The fact that the defendant died as a result of a wound in the neck caused by stabbing, was independently established by medical testimony; and the fact that he was stabbed with a knife during the altercation was also shown by the testimony of other bystanders, who saw the defendant brandish a knife in his right hand and then strike the deceased in the neck.

■ The defendant further contends that it was error to permit Government counsel to inquire of the defense witness Ella Jones on cross-examination whether a meretricious relationship existed between her and the defendant. The witness, however, declined to answer the question and the matter was not pursued. Consequently the point is moot. The question was, however, obviously admissible, first, in order to show her interest and bias in favor of the defendant; and second, as affecting her character and, therefore, her credibility. The Supreme Court has held that cross-examination for the purpose of putting a witness in his proper setting is not only permissible, but is a matter of right, Alford v. United States, 282 U.S. 687, 692, 51 S.Ct. 218, 75 L.Ed. 624. In Tla-koo-yel-lee v. United States, 167 U.S. 274, 17 S.Ct. 855, 42 L.Ed. 166, which involved an indictment for murder, the defendant's wife, who took the stand in behalf of the prosecution, was asked on cross-examination whether she was living with a male witness who had previously testified in behalf of the Government. An objection to this question was sustained. The Supreme Court held that this ruling was erroneous and that the error was of sufficient importance to require a reversal of the conviction, although no other error was discussed in the opinion. The following cases also hold that such a question is permissible: Thomas v. David, 7 C. & P. 651; Perdue v. State, 126 Ga. 112, 54 S. E. 820.

■ Still another ground advanced in support of the motion for a new trial, is the court's refusal to give an additional charge on the effect of the defendant's flight from the scene of the crime. The court's instructions to the jury contained the following observations on this point:

"There is evidence tending to show that the defendant fled from the scene immediately after Brock was wounded. The defendant denies that he fled. If you find that in fact he did flee from the scene, you have a right to consider this fact as a consciousness of guilt, if you deem it proper to do so."

No exception was taken to this instruction. It is well settled on the basis of human experience that flight may be considered as some indication of a consciousness of guilt, Liggins v. United States, 54 App.D.C. 302, 307, 297 F. 881; Kanner v. United States, 7 Cir., 34 F.2d 863, 866. As was said by Wilbur, J., in Strom v. United States, 9 Cir., 50 F.2d 547, 548, "Flight is always an evidence of guilt." "The wicked flee when no man pursueth", Proverbs 28:1.

■ Counsel for the defendant requested the court to elaborate and enlarge these remarks, by giving an additional charge to the effect that the defendant claimed that he ran from the scene not for the purpose of avoiding arrest, but because he feared attack by Brock's male companion. The court declined to instruct the jury further on this point, inasmuch as the entire matter had been left to the jury as a question of fact, and the original instruction called to the jury's attention the defendant's denial that he fled. Moreover, the defendant's contention that he ran away to avoid reprisals is contradicted by the fact that he failed to return when this danger was past, but was found by the police at his home an hour or two later. The present contention, therefore, appears to be without merit. It may be added that in the course of the charge to the jury, the court emphasized that his comments on the facts and on the evidence were not binding on the jury, that only such weight need be attached to them as the jury deemed proper, and that the jury were the final judges of the facts.

■ Finally, counsel for the defendant urges that it was error to permit Government counsel to inquire of the defendant on cross-examination whether it was not a fact that the court set bail in the sum of $1,500 and that, therefore, the defendant had an opportunity to obtain his release from incarceration while awaiting trial, if he had been able to secure a bond. While standing alone, this question seems irrelevant, it was actually proper, since on the direct examination, counsel for the defendant took great pains to elicit from the witness the fact that he had been in jail continuously from the time of his arrest, which took place an hour or two after the murder, and that he was a denizen of that institution at the time of the trial. Why this question was asked by defense counsel remains a mystery to the court, unless it was intended to create the impression on the jury that the defendant had been oppressed and harshly treated in a manner out of the ordinary. If so, the cross-examination on this point was manifestly germane to the direct examination. Actually, the defendant is not in a position to complain. The question asked by Government counsel was more likely to assist the defendant than to aid the prosecution, since it tended to give rise to an inference that the crime was not of sufficient gravity to require bail of more than $1,500. In any event, the matter was a passing and an inconsequential triviality that did not affect the course of the trial. See Bracey v. United States, 79 U.S.App.D.C. 23, 27, 142 F.2d 85.

Because of the vital importance of the matter to the defendant, great leeway was accorded to his counsel in cross-examining prosecution witnesses and in the direct and re-direct examination of his own witnesses. In order to accord him every opportunity to make as full a defense as he desired before the jury, the court at times even permitted defense counsel to propound inquiries whose exclusion would have been required by a strict application of the rules of evidence.

The court has no doubt of the defendant's guilt or any misgiving as to the justice of the conclusion reached by the jury. The crime of which the defendant stands convicted was a cruel and vicious act. It displayed a dire wickedness and a total disregard for the sanctity of human life with irretrievable and disastrous consequences to a harmless young man, whose life was suddenly snuffed out without reason or justification.

The motion for a new trial is denied.