Albert D. STANCIL, Appellant,

v.

UNITED STATES, Appellee.

No. 03–CM–444.

District of Columbia Court of Appeals.

Argued Dec. 10, 2004.
Decided Jan. 27, 2005.

Thomas T. Heslep, Washington, DC, for appellant.

Andrea L. Roth, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the briefs, for Public Defender Service, amicus curiae.

Valinda Jones, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the initial brief was filed, and John R. Fisher, Roy W. McLeese III, and Glen Donath, Assistant United States Attorneys, were on the initial brief, and with whom Kenneth L. Wainstein, United States Attorney, and John R. Fisher and Roy W. McLeese III, Assistant United States Attorneys,

were on the supplemental brief, for appellee.

Before SCHWELB and REID, Associate Judges, and KERN, Senior Judge.

SCHWELB, Associate Judge:

On January 6, 2003, following a bench trial, Albert D. Stancil was convicted of two counts of assault upon his wife, Roslyn Stancil,[1] and one count of possession of a prohibited weapon (knife) (PPW (b)).[2] The prosecution's evidence against Stancil consisted solely of the testimony of a Metropolitan Police Department officer, Shauntelle Anderson, who appeared at the Stancils' home in response to a 911 call. At Stancil's trial, Officer Anderson related, *inter alia*, certain statements that Mrs. Stancil made to the police shortly after they arrived at the scene of a domestic dispute that had turned violent.[3] Over defense objection, the trial judge admitted the out-of-court statements of Mrs. Stancil under the "excited utterance" exception to the hearsay rule. Stancil argued to the court, through counsel, that his wife "should be here today to testify to this."[4] The trial judge disagreed;[5] she admitted

1. D.C.Code § 22–404 (2001).

2. D.C.Code § 22–4514(b)(2001).

3. The officer also described, and the judge admitted, one remark made by the Stancils' daughter, Mia, then seven years and ten months old, to her father just as the police arrived; Mia, who was holding a kitchen knife, asked her father not to hurt her mother any more. The judge sustained a defense objection to Officer Anderson's proffered testimony regarding statements made by Mia's younger brother, Albert Stancil, Jr., then six years and three months old.

4. Stancil's argument is reminiscent of one made exactly four hundred years earlier in one of the most famous trials in Anglo–American legal history. In 1603, Sir Walter Raleigh, the renowned soldier, sailor, explorer, courtier and poet, and once a favorite of Her Majesty Queen Elizabeth I, stood trial for treason; he was prosecuted by Sir Edward Coke, who told Raleigh that "[t]hou art a monster! Thou hast an English face but a Spanish heart!" RALEIGH TREVELYAN, SIR WALTER RALEIGH 379 (2002). Justice Scalia, writing for the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 1360, 158 L.Ed.2d 177 (2004), described the key proceedings at Raleigh's trial:

> Lord Cobham, Raleigh's alleged accomplice, had implicated him in an examination before the Privy Council and in a letter. At Raleigh's trial, these were read to the jury. Raleigh argued that Cobham had lied to save himself: "Cobham is absolutely in the King's mercy; to excuse me cannot avail him; by accusing me he may hope for favour." 1 D. Jardine, Criminal Trials 435 (1832). Suspecting that Cobham would recant, Raleigh demanded that the judges call him to appear, arguing that "[t]he Proof of the Common Law is by witness and jury: let Cobham be here, let him speak it. Call my accuser before my face ...." 2 How. St. Tr., at 15–16. The judges refused, id., at 24, and, despite Raleigh's protestations that he was being tried "by the Spanish Inquisition," id. at 15, the jury convicted, and Raleigh was sentenced to death.
>
> One of Raleigh's trial judges later lamented that "the justice of England has never been so degraded and injured as by the condemnation of Sir Walter Raleigh."

*Id.* Raleigh was reprieved, but ultimately beheaded fifteen years later in execution of the original judgment. TREVELYAN at 538–43.

Although Raleigh "was, after all, perfectly free to confront those who read Cobham's confession in court," *Crawford*, 124 S.Ct. at 1364, "Raleigh's trial has long been thought a paradigmatic confrontation violation." *Id.* (citation omitted). The perceived (and, we think, actual) unfairness of Raleigh's trial contributed significantly to the introduction into the common law of the right of a criminal defendant to confront the witnesses against him. That right is now, of course, embedded in the Sixth Amendment to our Constitution.

5. The judge stated: "Mr. Soschin [Stancil's attorney at trial], that may be your view as a matter of public policy but the law does not require it."

Officer Anderson's testimony regarding what Mrs. Stancil had told the police, and she found Stancil guilty as noted above.[6]

On appeal, Stancil, supported by the Public Defender Service (PDS) as *amicus curiae*, relies on *Crawford* (which was decided fourteen months after his trial) and contends that he has been denied his right to confront the witnesses against him, in violation of the Sixth Amendment. He claims that Mrs. Stancil's out-of-court statements were "testimonial" as that term is used in *Crawford*, and that their admission, without a prior opportunity for cross-examination, therefore contravened the Confrontation Clause. The government responds that the point has not been preserved and that, in any event, the statements at issue were not testimonial.

For reasons set forth below, we are of the opinion that Stancil's Sixth Amendment claim was adequately preserved. We further conclude that while Mia's request to her father to stop hurting her mother was non-testimonial, and was properly admitted into evidence, there is reason to believe that some, if not all, of Mrs. Stancil's out-of-court statements were testimonial. See Part II.E., *infra*. In part because the parties at the time of the trial were not addressing the issues subsequently identified in *Crawford*, however, the record is unclear as to which, if any, statements were testimonial, and as to whether the evidence not excludable on the basis of the Confrontation Clause was sufficient to render the admission of any testimonial statements harmless beyond a reasonable doubt. Accordingly, we remand the record to the trial court for further proceedings consistent with this opinion.

## I.

## THE TRIAL COURT PROCEEDINGS

The significant constitutional issues raised in this appeal were generated by a disagreement between two parents regarding their children's diet. It is undisputed that on the afternoon of October 23, 2002, Stancil and his three children were at the home of his mother, who had been caring for them while their parents were at work. The children said that they were hungry, and Mr. Stancil gave them some alleged "junk food" to eat.[7] The children apparently told their mother about the food that their father had given to them, and Mrs. Stancil emphatically expressed her displeasure. She and her husband began to argue, the dispute degenerated into violence, and there was enough of a commotion to cause someone (whose identity is not disclosed by the record) to call 911.

Officer Anderson testified that on the afternoon in question, she received a radio run "to investigate trouble" at an address on 16th Street, N.W., which was the home of Stancil's mother. She and two other officers responded to that address, and they heard "yelling and screaming coming from inside the premises." The officers knocked on the door, the door "came open," and Officer Anderson observed a frightening scene:

> The complaining witness was standing with her children and the defendant's mother to the right and [Mia] the oldest daughter of the defendant and complaining witness was screaming with a knife in her hand pointing it at the defendant stating *stop hurting my mommy, stop hurting my mommy, I'm not going to let you hurt mommy any more.*

6. The judge granted Stancil's motion for judgment of acquittal as to a separate charge of PPW (b) (shod foot).

7. Stancil testified that he gave his children "a sandwich and some potato chips and something to drink...."

At that time, Mr. and Mrs. Stancil were standing only six or seven feet apart, with Mia between them. Officer Anderson told Mia to "please drop the knife, little girl." Mia complied and promptly burst into tears. Officer Anderson observed that Mrs. Stancil had a slight swelling "right around the eye socket." [8]

With the knife safely out of Mia's hands, the officers "got all the parties involved separated and calmed down." Immediately after the scene had been secured— "within a minute['s] time" after the police arrived—Officer Anderson was able to speak to Mrs. Stancil (to whom she repeatedly referred as the "complaining witness"), and to "interview" several of the persons present, one by one, beginning with Mrs. Stancil.

According to Officer Anderson,

after [Mrs. Stancil] informed me that they got into the argument over the junk food, that the defendant then hit her with a closed fist in her head. She stumbled back, he then proceeded to push her and when he pushed her she fell down on the ground. While she was on the ground the defendant began to kick her, hitting at her with his feet and his fist. The defendant then, I mean, the complaining witness started to scoot away from him as he continued to strike her while she was on the ground. The defendant's mother came between them [and] tried to separate them. At this point the complaining witness was briefly allowed to escape [the defendant's] blows that he was providing to her. The

defendant then went into the kitchen drawer, retrieved a steak knife and proceeded to chase the complaining witness around the house with it.

Mrs. Stancil further told Officer Anderson that as her husband was chasing her, she picked up a pot in order to stop him from trying to stab her with the knife.[9]

Stancil took the witness stand in his own defense. He testified that while he and his wife were arguing about the food that he had given to the children, Mrs. Stancil threatened to "get a knife, that she was going to stab me." He claimed that his wife had previously stabbed him a few years earlier, and that he was therefore concerned about her threats. As Mrs. Stancil was retrieving the knife from the drawer, Mr. Stancil pushed her away, and she fell to the ground. Mrs. Stancil still had the knife, so Mr. Stancil "took the knife from her ... [a]nd it just, it went on from there." Stancil claimed that he "really [didn't] remember my daughter holding a knife to me," nor did he recall the officers telling Mia to drop the knife. He insisted that he and his wife "were both coming at each other" and "travelling throughout the house," but he denied that he chased his wife with the knife, or, indeed, at all.[10]

In closing argument, the prosecutor emphasized the significance of the remark made by Mia upon the arrival of the police:

Your Honor, what could be more dramatic than a seven-year-old girl being forced to defend her mother by standing

---

8. Mrs. Stancil refused to let Officer Anderson see any bruises that Mrs. Stancil had on her stomach, but she was holding her stomach and complaining of pain.

9. It appears that after interviewing Mrs. Stancil, Officer Anderson spoke to Mia, who was "just eager to tell me what had happened in the house." Neither party, however, asked

Officer Anderson to describe Mia's account. The record does not disclose whether the police interviewed Mr. Stancil.

10. Stancil stated that he was 6 feet tall and weighed 270 pounds. His wife was 5 inches shorter at 5'7" and 110 pounds lighter at 160 pounds.

in between her mother and father holding a knife saying leave my mommy alone, you're not going to hurt my mommy anymore.

The trial judge agreed, and she found it

impossible for me to believe a father could be in a situation where his seven-year-old daughter is holding a knife and saying don't hurt mommy any more and have uniform[ed] police officers come into the house, and order that child to drop that knife, not to be able to remember that. He can't remember if he chased her. He doesn't know how she got the bruise on her face, and that's objective observed evidence by the police officer who has no reason to lie about the facts, that Ms. Stancil had a bruise on her face. [I]sn't the likely scenario here if we fill in the gaps left out by Mr. Stancil just as the complainant describes it in her excited utterance to the police?

Telling Stancil that "I just don't believe you," and crediting Mrs. Stancil's statement to the police (which the judge had previously admitted as an "excited utterance"),[11] the judge found Stancil guilty of the three counts that remained. This appeal followed.

---

11. The trial judge described the applicable standard to determine whether Mrs. Stancil's statement qualified as an excited utterance as being whether the statement was "the product of a traumatizing event that happened sufficiently soon before the statement was given that there was no opportunity for the absent declarant to falsify that statement." By overruling Stancil's objection, the judge answered this question in the affirmative. In his brief, Stancil's attorney suggests that the rationale for the admission of excited utterances should not apply here because "a statement made by a spouse after a domestic fight is *less* reliable than a calm statement, not more reliable." (Emphasis added.) Because he is now resting his claim exclusively on the

## II.

## LEGAL ANALYSIS

### A. *Preservation of the claim.*

■ The government asserts that Stancil did not preserve in the trial court his claim under the Confrontation Clause, and that our review should therefore be for plain error. We do not agree.

The question whether the admission of Officer Anderson's recitation of the out-of-court statements by Roslyn and Mia Stancil violated the defendant's rights under the Sixth Amendment was raised at least implicitly by Stancil's attorney, and the trial judge explicitly recognized that the issue was before her. As we have noted, defense counsel argued to the judge that Roslyn Stancil "should be here today to testify." While counsel did not specifically state that Mrs. Stancil should be present in person so that Stancil could confront and cross-examine her, it is difficult to imagine for what other purpose Stancil could have sought her presence.[12] The trial judge made it clear that she was fully aware of the constitutional issues which are presented when the prosecution bases its case largely on the hearsay statements by persons who have not been called to testify. In the judge's words, "the Sixth Amendment['s] Confrontation Clause is

intervening Supreme Court decision in *Crawford,* however, counsel for Stancil states that the quoted argument based on the law of evidence is now "unnecessary," and he is not pressing it on appeal.

12. Even assuming, *arguendo*, that counsel's remark, standing alone, did not assert a claim under the Confrontation Clause "with sufficient precision to indicate distinctly the party's thesis," *Hunter v. United States*, 606 A.2d 139, 144 (D.C.), *cert. denied*, 506 U.S. 991, 113 S.Ct. 509, 121 L.Ed.2d 444 (1992), we think that it did so in combination with the judge's own remarks.

implicated whenever an out-of-court statement comes in by somebody who is not sitting on the witness stand."

"The purpose of requiring a specific objection is to enable the prosecution to respond to any contentions raised and to make it possible for the trial judge to correct the situation without jettisoning the trial." *Hunter,* 606 A.2d at 144; *see also Adams v. United States,* 302 A.2d 232, 234 (D.C.1973). In this case, the trial judge was fully apprised of the constitutional issue before her, and she at least implicitly decided it. If the judge had believed that the Confrontation Clause had been violated (an issue that she explicitly identified), she would have excluded the challenged testimony. Under these circumstances, the rationale for treating the constitutional issue as having been waived, or for requiring Stancil to show plain error, has no application. In this case, as in *Chatmon v. United States,* 801 A.2d 92, 100 (D.C.2002), the appellant "benefits from the supervision of the trial by an attentive trial judge," who recognized the existence of a significant issue, here the applicability of the Confrontation Clause.

■ It is true, of course, that Stancil's attorney did not urge upon the trial judge the distinction between "testimonial" and "non-testimonial" out-of-court statements articulated in *Crawford,* nor did he assert that *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), partially overruled by *Crawford,* was incorrectly decided. But "[o]nce a ... claim is properly presented [to the trial court], a party can make any argument [in the appellate court] in support of that claim; parties are not limited to the precise arguments made below." *West v. United States,* 710 A.2d 866, 868 n. 3 (D.C.1998) (quoting *Yee v. Escondido,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992)). This is especially true where, as here, the new arguments presented on appeal by Stancil and by PDS were generated by a change in the law, and were not available to Stancil at trial. Accordingly, we hold that Stancil's claim of a Confrontation Clause violation was preserved, and we proceed to the merits.

### B. *The Confrontation Clause and the Crawford decision.*

The Sixth Amendment to the Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The phrase "witnesses against" could plausibly be read to mean [1] only "those who actually testify at trial, ... [2][or] those whose statements are offered at trial, ... or [3] something in between." *Crawford,* 124 S.Ct. at 1359 (citations omitted). In *Crawford,* the Supreme Court, after an exhaustive examination of the antecedents and history of the Confrontation Clause, rejected both of the first two of these possible readings. Instead, the Court concluded that the term "witnesses" encompasses some, but not all, hearsay declarants, *id.* at 1364, and specifically, that it includes those whose statements are testimonial. *Id.*

Prior to *Crawford,* and under the regime of *Roberts,* any out-of-court statement was constitutionally admissible so long as it either fell within a firmly rooted exception to the hearsay rule or bore "particularized guarantees of trustworthiness." *Id.* at 1369 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531). The change effected by *Crawford* was concisely summarized in *United States v. Saget,* 377 F.3d 223 (2d Cir.2004):

> *Crawford* abrogates *Roberts* with respect to prior testimonial statements by holding that such statements may never be introduced against the defendant unless he or she had an opportunity to

cross-examine the declarant, regardless of whether that statement falls within a firmly rooted hearsay exception or has particularized guarantees of trustworthiness. *See Crawford,* 124 S.Ct. at 1370, 1374.

*Id.* at 226.

Insofar as testimonial statements are concerned, the Sixth Amendment, as construed in *Crawford,* "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." [13] 124 S.Ct. at 1370. "Dispensing with confrontation because testimony is obviously reliable," continued Justice Scalia, "is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the *Sixth Amendment* prescribes." *Id.* at 1371. "Where testimonial evidence is at issue, ... the *Sixth Amendment* demands what the common law required:

unavailability and a prior opportunity for cross-examination." *Id.* at 1374.

In *Crawford,* the Court did not define "testimonial" statements, but it provided a number of illustrations. 124 S.Ct. at 1374.[14] Although the Court's extensive discussion provides helpful context, only one kind of "testimonial statement" described in the Court's opinion is relevant here, namely, a statement made during police interrogation. Quoting the definitions of the words "witnesses" and "testimony," in the 1828 edition of N. WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE,[15] Justice Scalia explained that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 1364. Accordingly,

[s]tatements taken by police officers in the course of interrogations are also tes-

---

**13.** In interpreting the meaning of the Confrontation Clause in the context of its history, Justice Scalia declared:

[T]he principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused. It was these practices that the Crown deployed in notorious treason cases like Raleigh's; that the Marian statutes invited; that English law's assertion of a right to confrontation was meant to prohibit; and that the founding-era rhetoric decried. The Sixth Amendment must be interpreted with this focus in mind.

124 S.Ct. at 1363.

**14.** "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 1374. The Court also stated:

Various formulations of this core class of "testimonial" statements exist: *"ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-

examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (THOMAS, J., joined by SCALIA, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing.

*Id.* at 1364 (citations omitted).

**15.** The word "witnesses" was defined in WEBSTER as those who "bear testimony," and "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.*

timonial under even a narrow standard. Police interrogations bear a striking resemblance to examinations by justices of the peace in England. The statements are not *sworn* testimony, but the absence of oath was not dispositive. Cobham's examination was unsworn .... [16]

\* \* \*

That interrogators are police officers rather than magistrates does not change the picture either .... In sum, even if the *Sixth Amendment* is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class.

*Id.* at 1364–65 (citations omitted). The Court emphasized that "[w]e use the term 'interrogation' in its colloquial, rather than any technical legal, sense." *Id.* at 1365 n. 4. Because the statement at issue in *Crawford* was made during the course of a police interrogation of Crawford's wife which incriminated Crawford, and was "knowingly given in response to structured police questioning," it "qualifie[d] under any conceivable definition." [17] *Id.*

## C. *Crawford and "excited utterances."*

■ This appeal presents to this court, for the first (but assuredly not the last) time, a question as to the proper application of the principles of *Crawford* to alleged "excited utterances" which have been admitted into evidence in domestic violence cases under an exception to the hearsay rule.[18] As the court observed in *Fowler v. State*, 809 N.E.2d 960 (Ind.Ct. App.2004), "[o]ne recent scholarly article

estimates that between eighty and ninety percent of domestic violence victims recant their accusations or refuse to cooperate with a prosecution." *Id.* at 965 (citing Tom Lininger, *Evidentiary Issues in Federal Prosecutions of Violence Against Women*, 36 Ind. L. Rev. 687, 709 n. 76 (2003)). Prosecutors in this jurisdiction obviously face the same problem and, as the trial judge explicitly recognized in this case, the government has frequently gone forward with domestic violence prosecutions without the alleged victim's cooperation or testimony, ordinarily by introducing into evidence, as excited utterances, out-of-court statements made by the alleged victims, or by other eyewitnesses, to investigating police officers or, in some cases, to 911 operators. *Cf. People v. Moscat*, 3 Misc.3d 739, 777 N.Y.S.2d 875, 878 (N.Y.City Crim.Ct.2004) ("because complainants in domestic violence cases often do not appear for trial, prosecutors have in recent years increasingly tried to fashion 'victimless' prosecutions").

In this case, the judge admitted all of Mrs. Stancil's statements to Officer Anderson under the excited utterance exception. On appeal, Stancil presents only a constitutional challenge, and he does not claim that the judge's ruling was incorrect as a matter of the law of evidence. See note 11, *supra*. We therefore treat as undisputed, for purposes of this appeal, the correctness of the judge's ruling that all of Mrs. Stancil's statements to Officer Anderson were admissible under the excited utterance exception.

**16.** Justice Scalia added that the unsworn character of Cobham's statement in the prosecution of Sir Walter Raleigh did not preclude that prosecution from being a "paradigmatic" denial of confrontation rights. *Id.*; see note 4, *supra*.

**17.** Perhaps teasing the reader just a little, Justice Scalia went on to say that "[j]ust as

various definitions of 'testimonial' exist, one can imagine various definitions of 'interrogation,' and we need not select among them in this case." *Id.* at 1365 n. 4.

**18.** Several other appeals involving excited utterances which were tried before the Supreme Court issued its decision in *Crawford* are presently pending in this court.

The question has been raised, in two recent cases cited to us by the government, whether an excited utterance in the kind of situation presented here can ever be "testimonial" in the *Crawford* sense. To address this question, we must consider the nature of this exception to the hearsay rule. Excited utterances were originally received in evidence on the theory that the declarant was so excited or agitated by the precipitating event that he or she was still "under the spell of [the event's] effect." *United States v. Edmonds*, 63 F.Supp. 968, 971 (D.D.C.1946).[19] Indeed, as the Court stated in *Crawford*,

> to the extent the hearsay exception for spontaneous declarations existed at all [in 1791], it required that the statements be made "immediat[ely] upon the hurt received, and before [the declarant] had time to devise or contrive any thing for her own advantage." *Thompson v. Trevanion*, Skin. 402, 90 Eng. Rep. 179 (K.B. 1694).

124 S.Ct. at 1368 n. 8. Spontaneous utterances were admitted if they were "made in the transaction . . . or while it was pending." *Packet Co. v. Clough*, 20 Wall. 528, 87 U.S. 528, 542, 22 L.Ed. 406 (1874).

In recent years, however, the hearsay exception for excited utterances has been broadened to include a non-spontaneous statement made "within a reasonably short period" after a startling event, even if it was made in response to police questioning. *See, e.g., Jones v. United States*, 829 A.2d 464, 466 (D.C.2003) (per curiam);

*Smith v. United States*, 666 A.2d 1216, 1222–23 (D.C.1995). These decisions countenance the admission, as excited utterances, of statements that can hardly be described as "reflex actions" or "verbal photographs or images of the contents of the brain." *Edmonds*, 63 F.Supp. at 971.

In *Hammon v. State*, 809 N.E.2d 945 (Ind.Ct.App.2004), the court perceived an inherent contradiction in the characterization of *any* excited utterance as "testimonial" within the meaning of *Crawford*:

> We further note that the very concept of an "excited utterance" is such that it is difficult to perceive how such a statement could ever be "testimonial." "The underlying rationale of the excited utterance exception is that such a declaration from one who has recently suffered an overpowering experience is likely to be truthful." *Hardiman v. State*, 726 N.E.2d 1201, 1204 (Ind.2000). To be admissible, an excited utterance "must be unrehearsed and made while still under the stress of excitement from the startling event." *Id.* "The heart of the inquiry is whether the declarants had the time for reflection and deliberation." *Id.* An unrehearsed statement made without time for reflection or deliberation, as required to be an "excited utterance," is not "testimonial" in that such a statement, by definition, has not been made in contemplation of its use in a trial. *See Crawford*, 124 S.Ct. at 1364.

*Id.* at 952–53; *accord, Fowler*, 809 N.E.2d

---

**19.** The court in *Edmonds* went on to say:

> Declarations made while the spell endures are uncontrolled. They are practically reflex actions and may be said to be verbal photographs or images of the contents of the brain. *Such utterances are likely to be made without any calculation as to their potential effect and without regard to their possible consequences.* They are apt to be the truth as the person knows it.

*Id.* at 971 (emphasis added). There is potential tension between the italicized language and one proposed definition of "testimonial" recognized in *Crawford:* "Statements that were made under circumstances which would lead an objective witness to believe that the statement would be available for later use at trial." 124 S.Ct. at 1364 (quoting *amicus* brief).

at 964 (quoting *Hammon*).[20]

Other courts, however, have rejected the *Hammon–Fowler* analysis. In *Lopez v. State*, 888 So.2d 693 (Fla.Ct.App.2004), the court considered the position articulated in *Hammon* and *Fowler* that an excited utterance can never be testimonial. The court disagreed:

> While this argument has some appeal at least on the surface, we do not think that excited utterances can be automatically excluded from the class of testimonial statements.
>
> In our view, the findings necessary to support a conclusion that a statement was an excited utterance do not conflict with those that are necessary to support a conclusion that it was testimonial. A statement made in the excitement of a startling event is likely to be more reliable given the fact that the declarant had little time to make up a story. But, under *Crawford*, reliability has no bearing on the question of whether a statement was testimonial. Some testimonial statements are reliable and others are not.

888 So.2d at 699. After distinguishing cases involving statements by declarants to family members or friends, the court stated:

> In contrast, a startled person who identifies a suspect in a statement made to a police officer at the scene of a crime surely knows that the statement is a form of accusation that will be used against the suspect. In this situation, the statement does not lose its character as a testimonial statement merely because the declarant was excited at the time it was made.

These principles lead us to conclude that the statement at issue was a testimonial statement. While it is true that Ruiz was nervous and speaking rapidly, he surely must have expected that the statement he made to Officer Gaston might be used in court against the defendant. He knew that Gaston was a policeman who was on the scene in an official capacity to investigate a reported crime. Even in his excitement, Ruiz knew that he was making a formal report of the incident and that his report would be used against the defendant.

*Id.*[21]

We find the reasoning of the court in *Lopez* persuasive. Some excited utterances are testimonial, and others are not, depending upon the circumstances in which the particular statement was made. Especially in light of the apparent expansion in recent years of the kinds of statements which fall under the rubric of the hearsay exception for excited utterances, we conclude that such utterances cannot automatically be exempted from the strictures of *Crawford*.

D. *Testimonial statements and police interrogation.*

We now turn to the task which Crawford explicitly left to future cases, and consider the meaning and application of the terms "testimonial statement" and, within that category, "police interrogation," to a scenario such as the one presently before us. PDS and the United States Attorney have both provided us with extensive, scholarly and most helpful submissions and case summaries address-

---

**20.** *Hammon* and *Fowler* were written by the same judge (on behalf of different panels of the court), and the two decisions were released on the same day.

**21.** The definition of testimonial statements in *Hammon* and *Fowler* was also rejected in *Kilday*, 20 Cal.Rptr.3d at 173 n. 9, as more restrictive than the Supreme Court contemplated in *Crawford*.

ing the meaning of these terms. Nevertheless, as is so often the case, we think that the correct interpretation lies somewhere between the positions of the contestants.

PDS advocates a broad interpretation of both terms, rejects what it sees as the government's over-emphasis on "structure" and formality, and suggests that any accusatory statement is testimonial. The government, on the other hand, stresses that testimonial statements must be "formal" and "official." Some of the differences are only in emphasis; in any event, our resolution of them follows.

In its brief, PDS attempts to defeat the government's position by resort to *reductio ad absurdum*. PDS quotes from a pre-*Crawford* law review article in which the authors "ask[ ] the reader to imagine a judicial system that advertised as follows":

> If you want to make a criminal accusation against a person, make the statement however you wish and present it to us in a way that we can pass it on to the fact-finder. If you want, you can make it in person to the fact-finder, but you don't have to. You can make it on audio or video tape, you can make it in writing (no need for a signature), you can make it by telephone (we've set up a special number, 911, for just that purpose), or you can make it to any person you want, with the request that he or she pass it on to us. And you don't have to take an oath. In fact, if you want to do the whole thing anonymously, that's OK, too. We can use the statement at trial however you make it.

Richard D. Friedman and Bridget McCormack, *Dial–In Testimony*, 150 U. Pa. L. Rev. 1171, 1247 (2002). Agreeing with the authors' characterization of such a regime as "appalling," *id.*, PDS asserts that to limit testimonial statements to formal declarations such as depositions or affidavits "would [create] an incentive to encourage the making of statements … lacking formalities such as the oath, because the avoidance of such formalities would ensure that the statement would not be covered by the Confrontation Clause." *Id.* Using some less than temperate terminology, PDS argues that "[s]uch an end-run around confrontation, the natural extension of the government's *fixation on formality*, would never have been countenanced by the Framers." (Emphasis added.)

In *Crawford*, the Supreme Court found it "implausible that a provision which concededly condemned trial by sworn ex parte affidavit thought [sic] trial by *unsworn ex parte* affidavit perfectly OK." 124 S.Ct. at 1365 n. 3. Indeed, we do not understand the government to be arguing the contrary. Nevertheless, we think that PDS' attempt to apply the quotation from the Friedman and McCormack article to the present controversy is less than convincing. After all, the Confrontation Clause is not the *only* safeguard against the admission of out-of-court statements. Unless such statements fall within a recognized hearsay exception, they continue to be inadmissible, and *Crawford* did nothing to undermine the protections provided to criminal defendants by the law of evidence. The parade of horribles conjured up in the Friedman–McCormack passage consists of the most rank hearsay. Unless the prosecution could show, *e.g.*, that an unsigned writing, or an anonymous telephone call, constituted an excited utterance or fell with some other hearsay exception—a very difficult showing in some of the cited examples—the out-of-court statement would be inadmissible. The requirement of some level of structure or formality, as advocated by the government, is consistent with *Crawford*, and we do not believe that PDS

has established that such a requirement is an absurd fixation.

PDS also appears to argue that Stancil can prevail in this case without showing that his wife's out-of-court statement was made in response to police interrogation. According to PDS, "[t]he community of legal scholars also nearly universally agrees that a statement is testimonial if, objectively, its maker should understand [that] it could be used prosecutorially." (Citations omitted.)[22] Under this theory, the word "testimonial" includes "all accusatory excited utterances made both to police officers and civilian bystanders." In *Crawford*, however, as we have previously noted, the Court explicitly distinguished between a "formal statement to [a] government officer[ ]" and "a casual remark to an acquaintance," and at least implied that the former is testimonial while the latter is not. 124 S.Ct. at 1364. Further, although the Court stated that the term "testimonial" applies "at a minimum" to prior testimony and to police interrogations, *id.* at 1374, it is unlikely that the Court intended the term to embrace contacts with the police that do not amount to interrogations.

We also find ourselves in disagreement with parts of the government's argument. Quoting from the decision of the Court of Appeals of Indiana in *Hammon*, the government asserts:

[T]he Supreme Court chose not to say that any police *questioning* of a witness would make any statement given in response thereto "testimonial"; rather, it expressly limited its holding to police "interrogation." ... [This] choice of words indicates that police "interrogation" is not the same as, and is much narrower than, police "questioning."

809 N.E.2d at 952 (emphasis added). Although the court in *Hammon* has supported its position with dictionary definitions of "interrogation,"[23] and has made a superficially plausible argument based upon these definitions, we think that the court's differentiation between "interrogation" and "questioning" cannot fairly be reconciled with Justice Scalia's articulation or overall approach in *Crawford*. The Court there stated that "[w]e use the term 'interrogation' in its colloquial, rather than any technical legal, sense," citing *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). *Crawford*, 124 S.Ct. at 1365 n. 4. In *Innis*, the Court described "interrogation" as "express questioning or its functional equivalent."[24] Moreover, the term "police interrogation" is used frequently in the *Crawford* opinion, without any suggestion that it means something more technical than questioning in a structured environment. Neither additional "formality" nor

---

**22.** All of the articles relied on by PDS were written before *Crawford* was decided. *Id.* at 12–13.

**23.**
"Interrogation" is defined in one common English dictionary as "To examine by questioning formally or officially." The American Heritage College Dictionary 711 (3d ed. 2000). This is consistent with our prior observation that the common characteristic of all "testimonial" statements is the formality by which they are produced. We also believe that "interrogation" carries

with it a connotation of an at least slightly adversarial setting. *See* Roget's Thesaurus II 556 (Expanded ed. 1988) (listing as first definition of "interrogate" as "To question thoroughly and relentlessly to verify facts: *interrogate the captured soldier*.").
*Hammon*, 809 N.E.2d at 952 (emphasis added in *Hammon*.)

**24.** The issue in *Innis* was whether certain actions by the police constituted the "functional equivalent" of interrogation. *See Innis*, 446 U.S. at 298, 100 S.Ct. 1682.

an "adversarial setting," however slight, is required.

■ We agree with the government, however, that

the types of statements cited by the Court as testimonial share certain characteristics; all involve a declarant's knowing responses to structured questioning in an investigative environment [25] or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings. *See [Crawford,* 124 S.Ct.] at 1365 n. 4 (stating that declarant's "recorded statement, knowingly given in response to structured police questioning," was made in an interrogation setting and was therefore testimonial).

*Saget,* 377 F.3d at 228. We also agree with the government that "[p]olice who respond to emergency calls for help and ask preliminary questions to ascertain whether the victim, other civilians, or the police themselves are in danger, are not obtaining information for the purpose of making a case against a suspect." Statements made to officers at this initial stage of the encounter—one might fairly call it "securing the scene"—are not testimonial. The government acknowledges, however, that "[i]n contrast, where police officers engage in structured questioning of victims or witnesses to a crime after the emergency has passed and the declarant is no longer under its effect, the resulting statements are more like the 'formal statement[s] to government officers' of concern in *Crawford*." We agree with this articulation, with the exception of the phrase "and the declarant is no longer under its effect"; these words, in our view, appear to imply that an "excited utterance" cannot

be testimonial, a proposition which we have rejected in Part II.C., *supra.*

The parties have brought numerous post-*Crawford* decisions to our attention. As we have seen, not all of them are consistent with one another; given the difficulty of the issue, this is hardly astonishing. Of the various recent cases, we have found the analysis in *People v. Kilday, supra* note 25, to be especially helpful.

In *Kilday,* a hotel manager's daughter called the police after Patricia Kiernan "reluctantly admitted [to the manager] that Kilday, her live-in boyfriend, intentionally burned her with an iron." 20 Cal. Rptr.3d at 165. Two police officers arrived in the hotel lobby and "encountered a frightened and upset Kiernan, the area was unsecured and the situation uncertain." *Id.* at 172. The court found

no indication in the record that the officers were aware of the nature of the crime at issue or the identity of the alleged assailant; whether Kilday was on or near the premises; whether Kilday possessed any weapons that could pose a danger to the officers or others; or whether Kiernan needed immediate medical attention.

*Id.* It was thus evident that the scene had not yet been secured.

Following a discussion of the case law, the court addressed the question whether the information reluctantly provided by Ms. Kiernan to the officers—namely, that Kilday had burned her—constituted a testimonial statement within the meaning of *Crawford:*

Based on the record before us, we conclude that Officers Cirina and Federico were not producing evidence in anticipation of a potential criminal prosecution

---

**25.** An "investigative environment" may, of course, be a home or a hotel room, depending on the circumstances. *See, e.g., People v. Kil-* day, 20 Cal.Rptr.3d 161, 165, 173–74 (Cal.Ct. App. 1st Dist.2004), discussed *infra.*

in eliciting basic facts from Kiernan about the nature and cause of her injuries. In reaching this conclusion, we do not adopt a blanket rule that all statements obtained from victims or witnesses by police officers responding to emergency calls are necessarily nontestimonial. The determination whether a statement obtained through police questioning in the field is testimonial requires a case-specific, fact-based inquiry. Under *Crawford,* this inquiry must center around whether the officer involved was acting in an investigative capacity to produce evidence in anticipation of a potential criminal prosecution. Here, where the responding officers were still principally in the process of accomplishing the preliminary tasks of securing and assessing the scene, we conclude that the statement elicited is not testimonial.

*Id.* at 173–74.

The court also addressed a later statement made by Ms. Kiernan after the scene had been secured. This second statement [26] was taken by Detective Denise Randall, a female officer who was summoned to the scene in order to make Ms. Kiernan more comfortable. In holding that this statement was testimonial, the court explained:

> [T]he totality of the circumstances surrounding the making of the statement lead us to conclude that it is testimonial under *Crawford* because at the time Randall obtained the statement from Kiernan, she was acting in an investigative capacity to produce evidence in anticipation of a potential criminal prosecution .... [B]y the time Randall questioned Kiernan the overarching

purpose of the interaction was obtaining a detailed statement; the responding officers had dealt with the exigent safety, security, and medical concerns initially predominant when officers arrive on a scene in response to a call for assistance.

*Id.* at 171–72.

■ A comparison of the two statements discussed in *Kilday* is significant for our purposes. We are in agreement with the court in *Kilday* that statements made to police officers while they are "securing the scene" often are not testimonial. However, once the scene has been secured, and once the officers' attention has turned to investigation and fact-gathering, statements made by those on the scene, in response to police questioning, tend in greater measure to take on a testimonial character, and they are thus ordinarily inadmissible under the Confrontation Clause in the absence of a prior opportunity for cross-examination.

### E. *Mrs. Stancil's statements.*

■ We now endeavor to apply the foregoing legal principles to the record before us. Specifically, we must decide whether some or all of the statements made by Mrs. Stancil to Officer Anderson were testimonial.

It is appropriate to point out at the outset that the order in which events relevant to this case occurred makes this a difficult inquiry. Stancil was tried and convicted on January 6, 2003. *Crawford* was not decided until March 8, 2004. Neither counsel at Stancil's trial had been provided with a crystal ball, and the parties were therefore in no position to liti-

---

**26.** The court also evaluated a third statement made by Kiernan during a tape-recorded interview in her hotel room. *Id.* at 171. Nearly identical to Sylvia Crawford's recorded statement to police in *Crawford,* this third statement qualifies as testimonial "under any conceivable definition." *Crawford,* 124 S.Ct. at 1365 n. 4.

gate the questions which, as a result of the Supreme Court's analysis in *Crawford*, have now become dispositive. The defense made no attempt to show that Mrs. Stancil's statements were testimonial,[27] and the prosecution did not seek to demonstrate that they were not. We therefore face the formidable task of attempting to comb the record for information required to decide questions which had not, and which could not have been, on the minds of court and counsel when the case was being tried.

In spite of this unavoidable difficulty, the record contains a substantial amount of information relevant to the issues at hand. Officer Anderson's testimony demonstrates that the activities of the police at the apartment can fairly be divided into two parts, to which we shall refer as Stage I and Stage II. In Stage I, the officers entered the apartment and observed Mia, holding a knife. The little girl was screaming at her father to "stop hurting my mommy." Officer Anderson directed Mia to drop the knife, and Mia did so. The officers then "got all the parties involved separated and calmed down...." In other words, the police first secured the scene. Upon the completion of this task, Stage I ended.

The officers then proceeded to Stage II, which began immediately after the parties had been separated and calmed down. At this point, according to Officer Anderson, she was "able to speak to the complaining witness...." Officer Anderson later testified that she "interview[ed]" Mrs. Stancil. She also stated that she subsequently talked to Mia and to Albert, Jr., and it is apparent from her narrative that she spoke with mother, daughter, and son separately and consecutively.

Throughout her testimony, Officer Anderson referred to Mrs. Stancil as the "complaining witness." In closing argument, the prosecutor stated that Mrs. Stancil's injuries were "entirely consistent with what the complainant testified happened...." He claimed that Mrs. Stancil "was hysterical and crying and testified ... to Officer Anderson, [providing] a plausible story [concerning her] injuries....".Defense counsel also referred to Mia's statement "stop hurting my mommy" and Albert, Jr.'s account (later stricken) as "testimony." There is thus considerable evidence that, at least in colloquial terms, all participants in the trial considered Mrs. Stancil to be a "witness" and her statement to Officer Anderson to be "testimonial." This cannot, of course, be dispositive; whether there was a police interrogation turns on what occurred, and not on labels used by the persons present. Nevertheless, the use of this terminology was arguably significant, because, when the officer and the attorneys spoke, they had no tactical reason for describing or not describing Mrs. Stancil as a witness or for characterizing or not characterizing her account as testimony. If the lawyers and the police believed that Mrs. Stancil was a "witness" who was giving "testimony," this is, in our view, a relevant factor in the calculus.

Moreover, we are satisfied that the separation of the potential witnesses, and Officer Anderson's individual and consecutive discussions with them, constituted "structured police questioning." *Crawford*, 124 S.Ct. at 1365 n. 4. We also agree with PDS that "[t]o say the least, it was highly foreseeable that when [Mrs. Stancil] described to police in an interview in detail that Mr. Stancil punched her, kicked her, and

---

**27.** Stancil's attorney did claim that "in this particular case the statement appear[s] to have been elicited in what we would submit would be a routine question and answer session."

struck her while she was on the ground, her accusatory words, establishing the facts of the alleged crime, would have punitive consequences." Moreover, once the scene was secured, the officers necessarily focused on whether a crime had been committed, for they were *required* to arrest a suspect "[i]f the preliminary investigation establishe[d] probable cause that an intrafamily offense had been committed." MPD General Order 304.11 at 2. The officer must make the arrest regardless of "[s]peculation that the victim may not proceed with the prosecution or that the case may not result in a conviction." *Id.* at 10.[28]

Nevertheless, the case is not as simple as the foregoing discussion might suggest, for the record also supports some contrary inferences. Officer Anderson testified that she spoke to Mrs. Stancil "within a minute" of the arrival of the police, and that at that time Mrs. Stancil was "shaking and crying." This is difficult to reconcile with the officer's testimony that Mrs. Stancil only talked to her "after we got all the parties involved separated *and calmed down* . . . ." (Emphasis added.) While "shaking and crying," Mrs. Stancil "informed" the officer of what her husband had done to her. This raises the possibility that Mrs. Stancil may have been talking to Officer Anderson spontaneously, immediately after the police arrived at the apartment, when the scene had not yet been secured and calm had not yet been restored.

Moreover, the trial judge's assessment of the events is especially significant, for she heard the testimony first hand. The judge addressed the point now under discussion as follows:

Whether [Mrs. Stancil's statement] was made in response to a question, I don't even know. But I know that it was said according to the officer's testimony as soon as the officer had the opportunity to speak with the complainant who was shaking and crying and had a fresh bruise on her face and was holding her stomach as if in pain.

In sum, there is evidence in the record to support an inference that at least some of what Mrs. Stancil told Officer Anderson came out during Stage I, before the persons in the apartment had been separated and had calmed down, and before any "question and answer" interview began. If this is what occurred, then any statements by Mrs. Stancil during Stage I, like Ms. Kiernan's first statement in *Kilday*, were not testimonial, and could therefore be properly admitted into evidence under the excited utterance exception to the hearsay rule without coming into conflict with the Confrontation Clause.

Given the uncertainty regarding what occurred, we think it appropriate to remand the record to the trial court for additional findings regarding whether the Confrontation Clause was violated. On remand, the court should determine, *inter alia,* which, if any, statements by Mrs. Stancil were volunteered during Stage I, before interrogation began, rather than having been made in response to Officer Anderson's questions in Stage II; and what, if anything, Mrs. Stancil said before the officers had completed their initial task of securing the scene, separating the principals, and restoring a reasonable measure of calm. If necessary, the trial judge should hold a further evidentiary hearing with respect to these questions.

---

**28.** Officer Anderson also testified that she completed a PD–163 (arrest report) "to establish the basic facts which are needed to bring charges against the defendant." Obviously, at least during Phase II, she was conducting a criminal investigation, and any statements obtained were therefore testimonial within the meaning of *Crawford.*

### F. *Harmless error analysis.*

The government argues that if any error was committed, it was harmless, and we note that, even without Mrs. Stancil's statements, the evidence against Mr. Stancil was substantial. Mia's excited request to her father to stop hurting her mother, which was certainly not testimonial under the standards articulated in this opinion, and which was therefore properly admitted, was a powerful indication that her father had assaulted Mrs. Stancil and that Mia, armed with a knife, wanted him to stop doing so. Mrs. Stancil had a facial bruise, the existence of which tended to corroborate Mia's implicit but obvious accusation. The judge disbelieved Stancil's account, for Stancil claimed not to remember events that he could not reasonably have forgotten. If Stancil lied under oath—and the judge effectively found that he did—then this is, in itself, strong evidence of guilt.[29] Thus, the government's suggestion that even if Mrs. Stancil's out-of-court statements were erroneously admitted, Stancil was not substantially prejudiced, contains a measure of plausibility.

Nevertheless, a violation of the Confrontation Clause is constitutional error, and if constitutional error occurred, the government must prove beyond a reasonable doubt that it was harmless. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Notwithstanding the substantial evidence of guilt, we conclude that, without at least some admissible statement from Mrs. Stancil incriminating her husband, the government has not satisfied its formidable burden under *Chapman*.[30]

### III.

### CONCLUSION

For the foregoing reasons, the record is remanded for further proceedings consistent with this opinion. Upon completion of the proceedings on remand, the trial court shall promptly transmit, as a supplemental record, its findings, the transcript of any further proceedings, and all other relevant materials to this court.[31]

*So ordered.*

---

**29.**

It has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.*

*Mills v. United States*, 599 A.2d 775, 783–84 (D.C.1991) (quoting II J. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed. 1979)) (emphasis added in *Mills* to last sentence only).

**30.** The prosecutor argued in his closing that Mr. Stancil's demeanor suggested untruthfulness, and the judge found Mr. Stancil not to be a credible witness. Because Mrs. Stancil, on the other hand, never took the stand, she was not cross-examined, and her credibility or lack thereof could not be explored. To be sure, there was other evidence tending to corroborate Mrs. Stancil's hearsay statement over her husband's sworn testimony, but the trial judge never had an opportunity to assess her demeanor or to determine her credibility on the basis of first-hand observation.

**31.** If the trial court concludes on remand that the Confrontation Clause was violated, the

determination whether or not the error was harmless beyond a reasonable doubt must be made by this court, and not by the trial court.

*Davis v. United States,* 564 A.2d 31, 42 (D.C. 1989) (en banc).